CP-1997-15                                                        1

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| In re:                                   | Querella            |
|                                          |                     |
|     Marcos Morell Corrada | 2003 TSPR 34    |
|     José Alcover García   | 158 DPR _____   |

Número del Caso: CP-1997-15

Fecha: 5/marzo/2003

Oficina del Procurador General:

      Lcdo. Francisco J. González Muñiz
      Procurador General Auxiliar

Abogados de los Querellados:

      Lcdo. José A. Cuevas Segarra
      Lcdo. Carlos M. Rivera Vicente
      Lcdo. Luis Berríos Amadeo

Materia: Conducta Profesional
    (La suspensión es efectiva a partir del 5 de marzo de 2003, fecha en que se le notificó a los abogados de su suspensión inmediata.)

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

In re:

Marcos Morell Corrada                        CP-97-15
José Alcover García

PER CURIAM

San Juan, Puerto Rico, a 5 de marzo de 2003.

El Procurador General presentó una querella en contra de los Lcdos. Marcos Morell Corrada y José Alcover García (en adelante, los querellados) por violaciones éticas incurridas en la representación de su cliente, la "Oficina para la Liquidación de las Cuentas de la Corporación de Renovación Urbana y Vivienda" (en adelante, Oficina de Liquidación). En síntesis, el Procurador sostuvo que los querellados violaron el Canon 21 de Ética Profesional[1] al adquirir un interés pecuniario en un bien de su cliente y comprometer, de esta forma, su juicio profesional independiente. Luego de que

---

[1] 4 L.P.R.A. Ap. IX, Canon 21.

los querellados sometieran sus respectivas contestaciones, nombramos un Comisionado Especial para que presidiera la vista evidenciaria, aquilatara la prueba presentada por las partes y nos preparara un informe en el cual se recogieran sus determinaciones de hechos. Examinado el Informe del Comisionado Especial concluimos que los querellados violaron los Cánones de Ética Profesional.

I

De las determinaciones de hechos realizadas por el Comisionado Especial se desprende que las acciones que motivaron el proceso disciplinario que nos ocupa se remontan al mes de mayo de 1993 cuando el Síndico de la Oficina de Liquidación contrató a los querellados, a través de su Bufete, para que éstos le rindieran servicios profesionales a dicha entidad; pactándose que la facturación por conceptos de honorarios de abogado sería por el importe de hasta $50,000 mensuales. El referido contrato estaría vigente por un año, aunque sería renovable por periodos iguales consecutivos. Como cuestión de hecho, el mismo fue renovado en varias ocasiones, mediante contratos consecutivos, hasta 1996.

Dichos contratos de servicios profesionales, suscritos entre el Bufete de los querellados y la

Oficina de Liquidación, estaban formulados en términos <u>amplios</u> y disponían que los querellados representarían a la Oficina de Liquidación en <u>todos</u> los asuntos en que se tuvieran que defender los derechos, obligaciones y prerrogativas de la oficina, según establecidos en su la ley habilitadora (Ley Núm. 55, de 9 de agosto de 1991, en adelante "Ley 55").[2]  Igualmente, los abogados representarían a

---

[2] Específicamente, los contratos tenían en común las siguientes cláusulas:

PRIMERA: "EL BUFETE" representará en los Tribunales o en las Agencias Administrativas del Estado Libre Asociado de Puerto Rico o los Estados Unidos a "El SÍNDICO", o a "LA OFICINA" o a sus empleados, en todos aquellos casos o asuntos

que por razón del cumplimiento de sus funciones y responsabilidades que le asigna la Ley Núm. 55, [*supra*] que crea "LA OFICINA", sean demandados o traídos ante dichos foros, o que sea necesario a estos comparecer para defender los derechos, obligaciones y prerrogativas que le asigna la Ley y que "EL SÍNDICO" les refiera. "El BUFETE" asumirá la representación legal de "LA OFICINA" en todo el proceso

de Ejecución de Hipoteca y/o Resolución de Contrato que se refiera y/o haya sido instado ante los Tribunales o Agencias del Estado Libre Asociado o de los Estados Unidos.

SEGUNDA: Además, "EL BUFETE" se compromete y obliga a prestar sus servicios profesionales como abogado de "LA OFICINA" asumiendo la representación legal de ésta ante los Tribunales de Justicia de Puerto Rico en

relación al cobro extrajudicial y judicial (entiéndase ejecuciones de hipoteca) de todos aquellos prestamos hipotecarios que "LA OFICINA" le refiera y acciones civiles y así se compromete a realizar todos los trámites necesarios para lograr tal representación.

DECIMO CUARTA: La negligencia o abandono de sus deberes, así como la conducta impropia en o fuera de "La OFICINA" por

"EL BUFETE", constituirá causa suficiente para dar por terminado este contrato inmediatamente sin necesidad de una notificación previa de más de cinco (5) días laborables.

DECIMO OCTAVA: "EL BUFETE" se compromete, durante la vigencia de este contrato, a no aceptar la representación legal de partes con intereses en conflicto con los de "LA OFICINA".

---

DECIMO NOVENA: La parte contratada reconoce que en el descargo de su función profesional tiene un deber de lealtad completa hacia la Agencia, lo que equivale el no tener intereses adversos a dicho organismo gubernamental. Estos intereses adversos incluyen la representación de clientes que tengan o pudieran tener intereses encontrados con la parte contratante, este deber, además, incluye la

obligación continua de divulgar a la agencia todas las circunstancias de sus relaciones con clientes y terceras personas y cualquier interés que pudiere influir en la agencia al momento de otorgar el Contrato o durante su vigencia.

La parte contratada representa intereses encontrados cuando, en beneficio de un cliente es su deber promover aquello a que debe oponerse en cumplimiento de sus

dicha oficina en los procesos de ejecución de hipoteca, resolución de contratos, cobro de préstamos hipotecarios y acciones civiles.

Por su parte, los contratos establecían que los abogados: (i) <u>no</u> representarían a partes con

---

obligaciones para con otro cliente anterior, actual o potencial. Representa intereses en conflicto, además, cuando su conducta es descrita como tal en las normas éticas reconocidas a su profesión, o en las leyes y reglamentos del Estado Libre Asociado de Puerto Rico.

En contratos con sociedades o firmas, constituirá una violación de esta prohibición el que alguno de sus directores, asociados o empleados incurra en la conducta aquí descrita. La parte contratada evitará aún la apariencia de la existencia de intereses encontrados.

intereses en conflicto con la Oficina de Liquidación; (ii) le deberían completa lealtad a ésta y no tendrían intereses adversos; (iii) divulgarían a la agencia sus relaciones con terceros y cualquier interés que pudiera influir en la agencia y; (iv) evitarían la apariencia de intereses encontrados.

Luego de la suscripción del contrato por servicios profesionales con la Oficina de Liquidación, los querellados advinieron en conocimiento de que cierta corporación ("Express Realty Inc.") estaba interesada en adquirir uno de los bienes pertenecientes a su cliente, (una finca en Aguadilla) para desarrollarla comercialmente. Posteriormente, los querellados llegaron a un acuerdo con Ángelo Medina, principal accionista de "Express Realty", en el cual se aseguró la adquisición de la finca a cambio de una participación para los querellados en el desarrollo de la misma. De esta forma, a tan sólo un (1) año de que el Lcdo. Morell Corrada y el Lcdo. Alcover García suscribieran el contrato de representación legal con la Oficina de Liquidación, el 7 de julio de 1994, la corporación "Express Realty", suscribió un contrato de opción de compra con la Oficina de Liquidación para adquirir una finca en Aguadilla propiedad de ésta última.

Con el fin de desarrollar la finca, sobre la cual existía un contrato de opción a favor de "Express Realty", se constituyó, el 22 de febrero de 1995, una sociedad especial denominada "Costa Mar", la cual estaba compuesta, en su origen, en partes iguales, por la esposa del señor Ángelo Medina y las esposas de los querellados; las señoras Carmen Casellas y Lilliam Ramos. Valga aclarar que el Lcdo. Marcos Morell Corrada estaba casado con la Sra. Carmen Casellas bajo el régimen ganancial, por lo que la participación en "Costa Mar" era propiamente de la sociedad legal de gananciales compuesta por el Lcdo. Marcos Morell y su esposa. En cuanto al Lcdo. Alcover García, si bien es cierto que éste estaba casado bajo capitulaciones matrimoniales, el Comisionado Especial nos advierte que dicho querellado adquirió una participación en "Costa Mar" cuando posteriormente, en 1995, compró una participación en la referida sociedad especial.

Según se desprende del Informe del Comisionado, desde su creación, "Costa Mar", comenzó a realizar gestiones, ante la empresa privada y el gobierno, para el desarrollo de la finca en cuestión. Inicialmente se realizaron trámites para atraer negocios de comida rápida y el establecimiento de una gasolinera. Estas gestiones

estuvieron a cargo de los querellados. Posteriormente, se gestionó exitosamente el desarrollo de la finca para ubicar las oficinas regionales del Fondo del Seguro del Estado, negocio que el Procurador General estima tuvo un valor millonario. Valga aclarar que muchas de estas gestiones se hicieron cuando la finca aún pertenecía a la Oficina de Liquidación, sujeta al contrato de opción otorgado con "Express Realty", por lo que la ventajosa posición de los querellados, como abogados de la referida oficina, los colocaba en la atípica situación de tener acceso a información de su cliente mientras realizaban todo tipo de trámites para viabilizar la compra.

El 23 de febrero de 1995, se celebró una reunión con el propósito de extenderle a, "Express Realty", el término del contrato de opción suscrito en el 1994.[3] En dicha reunión, celebrada, un día después de la creación de "Costa Mar", el señor Ángelo Medina solicitó a la Oficina de Liquidación que autorizara a "Express Realty" cederle a "Costa Mar" la opción de compra que tenía sobre la finca de Aguadilla para

---

[3] El contrato pactado el 7 de julio de 1994 tenía una vigencia de noventa días. Esto implica que el mismo venció el 6 de octubre de 1994. Según se desprende del Informe del Comisionado, el Sr. Ángelo Medina había solicitado, en fecha anterior

que, de esta forma, "Costa Mar" adquiriera la finca. En esta reunión estuvo presente el Sub-síndico de la Oficina de Liquidación (señor Arturo Paz), el señor Ángelo Medina y el Lcdo. Alcover García. El Lcdo. Morell Corrada no participó en esta reunión. Tampoco participaron las esposas de los querellados y del Sr. Medina, quienes figuraban como las únicas propietarias de "Costa Mar" quien sería la cesionaria del contrato de opción.

Surge del Informe del Comisionado Especial que, en dicha reunión se le informó al Sub-síndico de la existencia de "Costa Mar", de sus socias, y de la intención de hacer la cesión. Sin embargo, no surge que el Sub-síndico tuviera otro asesoramiento, respecto a la validez de la cesión, que aquél que le pudo haber hecho el propio Lcdo. Alcover García. Más aún, no existe indicio alguno de que hubiere una explicación de los detalles de la transacción, de los efectos potenciales que tendría para la relación abogado-cliente la adquisición de un bien del cliente por parte de una entidad en la que los querellados tenían un interés, (como sería informar que la adquisición de la finca podría afectar el juicio profesional de los querellados), y de la deseabilidad de que la

al 23 de febrero, una extensión del término del contrato de opción, la cual fue concedida.

Oficina de Liquidación obtuviese el consejo legal independiente de otro abogado con respecto a dicha transacción.

Aunque no surge que el Lcdo. Alcover García estuviera representando a "Costa Mar" en dicha reunión, éste tuvo una participación activa, directa y personal en el trámite de cesión ante la Oficina de Liquidación, siendo además el único abogado en las conversaciones. Además, en dicha reunión, el Sr. Medina informó su interés de que el Lcdo. Alcover García fungiera como notario en el contrato de cesión. Como señaláramos anteriormente, en ese momento, el Lcdo. Alcover García no le informó al Sub-síndico del conflicto de intereses que le representaba esta transacción debido a que éste, al igual que el Lcdo. Morell Corrada, eran abogados de la Oficina de Liquidación y, a la misma vez, tenía un interés en el bien objeto de la transacción. Tampoco recomendó a la Oficina de Liquidación que contratara una representación legal independiente para que le asesorara en la venta contemplada por la sociedad especial compuesta por las esposas.

Los trámites de la cesión fueron inicialmente fructíferos, pues, según indica el Comisionado: "[l]uego del correspondiente análisis, siendo el único abogado presente el Lic. Alcover García, el

Subsíndico concluyó que no había impedimento legal para la cesión de la opción". Sin embargo, cuando se le informó de la cesión al Síndico de la Oficina de Liquidación, éste la desautorizó.

Por esta razón, "Express Realty", procedió a comprar la finca directamente a la Oficina de Liquidación, mediante escritura otorgada ante el Lcdo. Alcover García, por la suma de $255,165.62, precio que, según indica el Comisionado Especial, superó la tasación de la propiedad en un veinte porciento (20%). Tres (3) días más tarde, "Express Realty" vendió la finca a "Costa Mar" por el <u>mismo precio</u> que había pagado por la propiedad. Cabe puntualizar que <u>todos</u> estos trámites ocurrieron <u>mientras</u> los querellados eran <u>abogados</u> de la Oficina de Liquidación.

Luego de la adquisición de la finca por "Costa Mar", los querellados continuaron participando en los trámites dirigidos al desarrollo de la parcela. Sin embargo, cuando ya era evidente que las gestiones estaban encaminadas hacia la construcción de un edificio comercial para ser arrendado al Fondo del Seguro del Estado, el Lcdo. Morell Corrada decidió desvincularse del negocio para evitar lo que denominó: "situaciones difíciles, que se prestaran a malas interpretaciones e insinuaciones". Esto pues, dado el hecho que el Lcdo. Morell Corrada, quien

había presidido el Comité de Transición durante el cambio de gobierno tras las elecciones generales de 1992, quería evitar cualquier imputación de que hubiese aprovechado dicha posición para advenir en conocimiento de la necesidad del Fondo del Seguro del Estado de ubicar sus oficinas regionales en Aguadilla, lugar donde ubica la finca adquirida por "Costa Mar". Esto por virtud de los informes que rendían las agencias gubernamentales a dicho comité sobre su estado de situación y los proyectos que llevaban a cabo.

Por ello, la sociedad de bienes gananciales compuesta por el Lcdo. Morell Corrada y su esposa vendió su participación en "Costa Mar" al Lcdo. Alcover García en 1995, fecha en que los querellados todavía fungían como abogados de la Oficina de Liquidación.[4]

La controversia ante nos requiere dilucidar si los querellados infringieron el Canon 21, sobre intereses encontrados, cuando adquirieron un interés pecuniario sobre un bien de un cliente a quien se supone representaran en cualquier asunto relacionado a la liquidación de las cuentas de la C.R.U.V.

---

[4] A raíz de estos hechos, el Lcdo. Aníbal Acevedo Vilá presentó la queja juramentada en contra del Lcdo. Morell Corrada y el Lcdo. Alcover García que originó la investigación del Procurador General y el inicio del procedimiento disciplinario que nos ocupa.

II

Antes de explicar el derecho aplicable a la controversia de autos, es menester señalar el contexto dentro del cual se desarrollaron los hechos que tenemos ante nos, y que dieron lugar al procedimiento disciplinario que nos ocupa.

La Oficina de Liquidación fue creada para liquidar todos los activos y pasivos de la "Corporación de Renovación Urbana y Vivienda" (en adelante, C.R.U.V.) y utilizar el producto de dicha liquidación para atender las obligaciones financieras de esta última dependencia[5].

Según se desprende de la exposición de motivos de la Ley Núm. 55, (la cual ordenó la disolución de la C.R.U.V. y la creación de la Oficina de Liquidación), la crítica situación financiera por la que atravesaba la C.R.U.V. exigía que la misma se disolviera. Para tales propósitos, la Legislatura pretendió establecer, mediante dicha legislación, un proceso ordenado de liquidación de las cuentas de la C.R.U.V. que permitiera que dicha entidad cumpliera con sus responsabilidades financieras utilizando sus propios recursos. Así, se advirtió que resultaba crucial realizar todas las gestiones necesarias para atender en su totalidad las deudas y obligaciones de

dicha entidad con sus propios activos.[6] La función principal de la Oficina de Liquidación era, por tanto, obtener la mayor ganancia posible de la venta de sus activos para poder cubrir, con sus propios recursos, las deudas contraídas.

Consciente de la trascendental función con la que se envestía a la Oficina de Liquidación, el legislador expresamente dispuso que: "[l]os propósitos para los cuales se crea [...] y para los cuales ejercerá sus poderes, son propósitos públicos para el beneficio del pueblo de Puerto Rico y el ejercicio de los mismos constituye el cumplimiento de funciones gubernamentales esenciales".[7]

Para llevar a cabo esta encomienda, se dispuso que un Síndico Especial administraría y dirigiría la Oficina de Liquidación, teniendo la responsabilidad de realizar todas las gestiones necesarias y convenientes para maximizar el valor de los activos de la C.R.U.V., a fin de cumplir con el mayor número de sus responsabilidades financieras.[8] Entre sus poderes se encontraban: (i) asumir el control de todos los activos y derechos legales de la C.R.U.V. para iniciar el cobro de

---

[5] Véase, Ley Núm. 55, *supra*.
[6] Art. 18 de la Ley Núm. 55, *supra*.
[7] Art. 14 de la Ley Núm 55, *supra*. Énfasis suplido.
[8] Art. 1 de la Ley Núm 55, *supra*.

todas las reclamaciones[9] y; (ii) tramitar el cobro de préstamos, deudas, cuentas y reclamaciones que surgieran en el proceso de liquidación.[10] De la misma forma, la Oficina de Liquidación tenía autoridad para demandar y ser demandada y radicar toda clase de acciones judiciales y administrativas.[11]

Para asegurar que la Oficina de Liquidación pudiera cumplir eficazmente con sus facultades legales, como sería, por ejemplo, recuperar activos y resolver contratos para satisfacer los compromisos económicos de la C.R.U.V., la Ley Núm. 55 dispuso que el Síndico podría <u>contratar</u> los <u>servicios legales</u> necesarios para la tramitación de los asuntos legales relacionados con el desempeño de sus funciones.[12] Más aún, para garantizar que los abogados contratados ejercieran una labor idónea, con un juicio profesional independiente y libre de conflictos de interés, el legislador expresamente <u>prohibió</u> contratar "abogados o bufetes que estén bajo contrato con otras agencias o instrumentalidades públicas".[13] Cónsono con este propósito la Ley Núm. 55 definió de manera amplia el término "agencia o instrumentalidad pública",

---

[9] Art. 2 de la Ley Núm 55, *supra*.
[10] Art. 5 de la Ley Núm 55, *supra*.
[11] Art. 9 de la Ley Núm 55, *supra*.
[12] Art. 12 de la Ley Núm 55, *supra*. Énfasis suplido.

precisando que incluía a las corporaciones públicas.[14]

Es al amparo de este marco legal que surge la controversia ética de autos.

III

El Canon 21 del Código de Ética Profesional, 4 L.P.R.A. Ap. IX, dispone en lo pertinente:

> El abogado tiene para con su cliente un deber de lealtad completa. Este deber incluye la obligación de divulgar al cliente todas las circunstancias de sus relaciones con las partes y con terceras personas, y cualquier interés en la controversia que pudiera influir en el cliente al seleccionar su consejero. Ningún abogado debe aceptar una representación legal cuando su juicio profesional pueda ser afectado por sus intereses personales.
>
> No es propio de un profesional el representar intereses encontrados[...]

Como se conoce, la citada disposición está dirigida a asegurar la lealtad del abogado para con su cliente y evitar que un abogado incurra en la representación de intereses encontrados. In re Toro Cubergé, 140 D.P.R. 523, 529 (1996). El deber de lealtad completa que, en parte, consiste en el requisito de ejercer un criterio profesional independiente y desligado de los intereses personales, proscribe que un abogado represente a

---

[13] Id. Énfasis suplido.

un cliente cuyos intereses estén reñidos con los suyos propios. Liquilux Gas Corp. V. Berríos, 138 D.P.R. 850, 858 (1995). Por lo tanto, el cumplir con el deber de lealtad para con su cliente presupone la inexistencia de conflictos de intereses. El abogado no puede cumplir con este deber cuando éste alberga algún interés personal el cual podría estar en conflicto con los intereses de su cliente o al menos pudiese afectar la independencia de su juicio profesional. Al así proscribirlos se busca preservar una completa lealtad del abogado hacia su cliente, libre de ataduras personales. In re Pizarro Colón, res. el 25 de mayo de 2000, 2000 T.S.P.R. 106; In re Palau Bosch, res. el 30 de junio de 1999, 1999 T.S.P.R. 132. En fin, una de las situaciones que el Canon proscribe es aquella en la cual el deber de lealtad completa que tiene el abogado para con su cliente podría ser incompatible con algún interés propio que el abogado también quiera promover o defender. In re Toro Cubergé, *supra,* a la pág. 530; Liquilux Gas Corp. v. Berríos, *supra*; In re Belén Trujillo, 126 D.P.R. 743 (1990).

Entre las distintas manifestaciones de intereses encontrados que el Canon prohíbe se encuentra el que un abogado acepte una

---

[14] Art. 21 de la Ley Núm 55, *supra*.

representación legal, o que continúe en ella, cuando su juicio profesional pueda ser afectado por sus intereses personales. Hemos señalado que esta vertiente exige que el abogado ejerza un criterio profesional independiente y desligado de intereses personales. De este modo, se busca preservar la autonomía de juicio del abogado y prevenir cualquier tipo de dilución a la fidelidad que le debe a su cliente. In re Toro Cubergé, *supra*.

El propio Canon esboza que, en los casos en que existan intereses encontrados, el deber de lealtad completa exige que el abogado divulgue todas aquellas circunstancias sobre relaciones con terceras personas que pudiesen afectar la relación abogado-cliente. De la misma forma, se le exige al abogado divulgar cualquier interés que tenga en la encomienda que se le ha encargado. 4 L.P.R.A. Ap. IX P.III C. 21.

Las transacciones comerciales entre un abogado y su cliente o aquellas instancias en que un abogado, a sabiendas, adquiere un interés pecuniario, propietario o posesorio en un bien de su cliente, han motivado nutridas discusiones por los potenciales conflictos de interés que acarrea. Las mismas han sido reconocidas como situaciones que podrían crear en el abogado un conflicto entre los intereses del cliente y los propios, pudiendo

afectar su juicio profesional. A tales efectos, se ha resaltado que las transacciones comerciales con un cliente son inherentemente sospechosas.[15] Esto pues, no sólo el juicio profesional independiente del abogado puede ser seriamente afectado por sus intereses personales en la transacción, sino que la naturaleza desigual de la relación abogado-cliente (en la que el abogado adquiere un sinnúmero de información íntima del cliente y éste a su vez deposita su confianza y lealtad en el abogado) la hace susceptible de múltiples abusos.[16]

---

[15] Véase, ABA Formal Opinion 92-364 (6 de julio de 1992), en donde al comentar sobre las Reglas Modelos se señaló:

> "Business transactions concurrent with the attorney-client relationship are inherently suspect. Generally, a lawyer who benefits from a financial transaction with a client must show that the transaction was fair, equitable and just, and that it did not proceed from undue influence. Thus, Rule 1.8(a) [of the A.B.A. Models Rules of Professional Conduct] prohibits business transactions unless full disclosure is made, the client is advised to seek the advice of independent counsel, and the client's written consent is obtained. […] These provisions safeguard clients from lawyers who abuse their ability to influence their client for their own financial gain. This protection is called for because the unequal nature of the lawyer-client relationship makes it particularly susceptible to abuse."

[16] Susan Saab Fortney & Jett Hanna, Fortifying a Law Firm's Ethical Infrastructure: Avoiding Legal

Ciertamente, la relación abogado-cliente está enmarcada dentro de los más altos niveles de fidelidad y confianza. Como indicara el Tribunal Supremo federal hace más de un siglo:[17]

> "There are few of the business relations of life involving a higher trust and confidence than that of attorney and client, or generally speaking, one more honorably and faithfully discharged; few more anxiously guarded by the law, or governed by sterner principles of morality and justice; and it is the duty of the court to administer them in a corresponding spirit, and to be watchful and industrious, to see that confidence thus reposed shall not be used to the detriment or prejudice of the rights of the party bestowing it."

Es precisamente la naturaleza de esta relación, (mediante la cual un abogado adquiere numerosa información confidencial de su cliente, ganándose su confianza y lealtad), la que la hace

_____

Malpractice Claims Based on Conflicts of Interest, 33 St. Mary's L.J. 669, 705 (2002), ("Anytime an attorney enters a business transaction with a client, there is a risk of overreaching due to the attorney's legal skill and training, as well as the client's trust and confidence. To avoid abuse, disciplinary rules require that attorneys take special precautions relating to business transactions with clients"). Véase, además, ABA Formal Opinion 92-364 (6 de julio de 1992); Bruce Zucker, Attorneys Who Enter into Business Transactions with Their Clients: A Presumption of Undue Influence, Malpractice, and Impropriety, 1 J. Legal Advoc. & Prac. 7 (1999); American Law Institute, Restatement of the Law Third, The Law Governing Lawyer: Proposed Final Draft No. 1, sec. 207, págs. 639-640 (1996).

[17] Stockton v. Ford, 52 U.S. 232, 247 (1850).

objeto de potenciales abusos. Cada vez que un abogado realiza una transacción con su cliente se plantea la posibilidad de que el letrado utilice sus destrezas legales y su posición para aprovecharse del cliente, utilizando, por ejemplo, su influencia o la información confidencial obtenida, para su beneficio personal.[18] Por tales razones, los tribunales han sido sumamente rigurosos al analizar las mismas. Como bien ha advertido el Tribunal Supremo de Missouri:

> "becoming personally involved with the affairs of clients [...] is an area wrought with pitfalls and traps and the Court is without choice other than to hold the attorney to the highest of standards". In re Lowther, 611 S.W.2d 1, 2 (Mo., 1981).

Precisamente, en In re Toro Cubergé, *supra*, abordamos este asunto. En efecto, la norma que allí establecimos va dirigida a prohibir, de ordinario, las transacciones comerciales entre un abogado y su cliente cuando las mismas tienen el potencial de afectar el juicio profesional independiente del abogado o cuando éstas puedan afectar el deber de lealtad y fidelidad que se le debe al cliente.

En dicho caso fuimos muy claros al expresar nuestra preocupación de que el juicio profesional independiente de un abogado pudiese ser afectado

---

[18] Véase, A,B.A. Model Rules ("A lawyer may not exploit information relating to the representation to the client's disadvantage.")

por su interés personal en la transacción comercial con su cliente. Por ello, puntualizamos la importancia de que la comunidad legal se mantuviera a la altura del Canon 21, sin que incurriera en relaciones comerciales con sus clientes que pudieran influir en la gestión profesional y diluir la fidelidad que se le debe al cliente.

Igualmente, en aquella ocasión reconocimos que el conflicto de interés puede surgir, no sólo de la participación personal del abogado en el negocio, sino incluso por virtud de una tercera persona jurídica que intervenga en el mismo; como lo sería una transacción comercial entre un cliente y una corporación en la que el abogado tuviese un interés o con la que estuviese relacionado.

Así, aunque en In re Toro Cubergé, *supra*, manifestamos mayores reservas cuando se trata de un abogado que directa y personalmente entra en negociaciones comerciales con su cliente, intimamos que un abogado no evadiría los rigores éticos por el mero hecho de que, a sabiendas, adquiera un interés pecuniario adverso a su cliente por virtud de una tercera persona jurídica. Aún en tal caso, el abogado estaría sujeto a cumplir con las Cánones de Ética, exigiéndose, que satisfaga ciertos requisitos mínimos de divulgación y de orientación con respecto a su cliente, tales como exponerle al

cliente las circunstancias de la relación con la tercera persona y el <u>efecto</u> que tendría la transacción sobre la relación abogado-cliente.

Específicamente, indicamos que el abogado tendría que revelarle a su cliente en detalle: "cuál era la relación con la corporación, qué intereses tenía él en la transacción, <u>cómo podía afectarse la relación abogado-cliente entre ellos</u>, y la deseabilidad de que el cliente obtuviese consejo legal independiente de otro abogado con respecto a dicha transacción".[19] El caso de autos nos permite ampliar dichos pronunciamientos.

IV

Las normas de divulgación, (en conjunción con el asesoramiento legal independiente del cliente), que como mínimo resaltamos en <u>In re Toro Cubergé</u>, *supra*, cuando la transacción se realiza en virtud de una persona jurídica con la que el abogado está relacionado, son análogas a las medidas que se formulan en las Reglas Modelos promulgas por la "American Bar Association" para regular las transacciones de negocios entre abogado y cliente. En efecto, la Regla Modelo 1.8(a) establece varias exigencias en protección del cliente, tales como

---

[19] <u>In re Toro Cubergé</u>, *supra* a la página 533-534 (nota al calce número 1); Énfasis suplido.

explicarle a éste detalladamente la transacción de una manera que la pueda entender y la oportunidad de obtener representación legal independiente para la transacción. En particular, la referida Regla dispone:

> "Rule 1.8- Conflict of Interest: Prohibited Transactions
>
> (a) A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:
>
>> (1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which can be reasonable understood by the client;
>>
>> (2) the client is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and
>>
>> (3) the client consents in writing thereto."

En términos generales, la Regla Modelo 1.8(a) prohíbe que un abogado realice transacciones comerciales con su cliente o que, a sabiendas, adquiera un interés pecuniario, propietario o posesorio que sea adverso a éste, sin cumplir con los requisitos elaborados para proteger y salvaguardar al cliente. A tenor con dicha regla, todas las transacciones entre un cliente y su abogado deben ser justas y razonables para el cliente. Además, se exige que se le otorgue al

cliente: (i) una oportunidad razonable de obtener consejo legal independiente sobre la transacción y; (ii) una divulgación detallada sobre la transacción de manera que éste pueda entenderla razonablemente. Véase, A.B.A., Annotated Model Rules of Profesional Conduct, pág. 120, (3ra. Ed. 1996).[20]

De esta forma, se condicionan las transacciones comerciales entre abogado y cliente a que se cumplan con una serie de requisitos, entre los que se encuentra que el cliente reciba aquella información adecuada que le permita analizar completamente la transacción.[21] Así, antes de entrar en una transacción comercial con un cliente, la

---

[20] Véase, además, ABA Formal Op. 00-416 (7 de abril de 2000), donde se señaló:

> "Rule 1.8(a) requires that business dealings between a lawyer and a client be fair and reasonable to the client, that the client be given the terms of the transaction in writing and the opportunity to consult counsel, and that the client consents in writing to the transaction. These safeguards are for the protection of the client. A lawyer's failure to make necessary disclosures to a client or to obtain the client's informed consent places the lawyer in violation of Rule 1.8(a). What disclosures are necessary will depend upon the facts and circumstances of the particular transaction. The required disclosures relate to the transaction itself and its terms and to those related facts known to the lawyer at the time of the transaction."

[21] Fred C. Zacharias, Limits on Client Autonomy in Legal Ethics Regulation, 81 B. U. L. Rev. 199, 203 (2001).

referida Regla exige que el abogado le explique a su cliente completamente la transacción, lo que incluye divulgar las repercusiones que ésta tendría para la relación abogado-cliente, como por ejemplo, el potencial de conflicto que pueda acarrear.[22]

Precisamente, al comentar dicha regla la "American Bar Association" advierte que la misma requiere una divulgación completa, mediante la cual se expliquen los detalles de la transacción y los efectos potenciales que la misma tendría para la relación abogado-cliente; como sería informar que la transacción podría afectar el juicio profesional independiente del abogado. Véase, A.B.A. Formal Op. 00-418 (7 de julio de 2000).

Entre los elementos constitutivos de una divulgación adecuada se han destacado los siguientes: (i) todas las circunstancias relevantes de la transacción que sean conocidas por el abogado; (ii) la naturaleza de la transacción, el interés del abogado en la transacción y cualquier efecto potencial adverso que la transacción pueda tener en el cliente; (iii) la naturaleza de los intereses del abogado y el efecto que éstos podrían tener sobre su desempeño profesional; (iv) consejo específico acerca de la necesidad de buscar consejo

legal independiente y una explicación detallada de todos los riesgos asociados con la transacción comercial y; (v) una declaración clara sobre los riesgos y desventajas para el cliente. Véase, ABA/BNA Lawyers' Manual on Professional Conduct Sec. 51:504-505 (Suplemento 1996).

Estos requisitos de divulgación, mediante los que se le provee al cliente una información completa y cabal sobre la transacción y sus repercusiones, no son meramente requisitos pro forma; en efecto, gran parte de las acciones disciplinarias bajo la Regla Modelo 1.8(a), o su equivalente en las jurisdicciones estatales, se producen debido a la omisión de los abogados en realizar las divulgaciones necesarias. Véase, A.B.A., Annotated Model Rules of Professional Conduct, pág. 123, (3ra. Ed. 1996).

Por otro lado, el Canon 38 dispone que el abogado debe esforzarse al máximo en la exaltación del honor y dignidad de su profesión evitando hasta la apariencia de conducta impropia. En otras palabras, todo abogado tiene la obligación de evitar, tanto en la realidad como en la apariencia, la impresión de conducta conflictiva. In re Pizarro Santiago, 117 D.P.R. 197 (1986). El abogado

---

[22] Véase, ABA/BNA Lawyers' Manual on Professional Conduct Sec. 51:504 (Suplemento 1996).

tiene "el deber de lucir puro y libre de influencias extrañas a su gestión profesional, y que en el descargo de sus responsabilidades profesionales, debe cuidarse de que sus actuaciones no den margen a la más leve sospecha de que promueve intereses suyos encontrados con los de su cliente". In re Toro Cubergé, *supra*, a la pág. 532. Véase In re Colón Ramery, 133 D.P.R. 555, (1993); In re Rojas Lugo, 114 D.P.R. 687 (1983).

A la luz de esta normativa, resolvemos las querellas presentadas por el Procurador General en contra de los licenciados Marcos Morel Corrada y José Alcover García.

V

Esencialmente, la controversia en el procedimiento disciplinario que nos ocupa requiere que determinemos si los querellados, al adquirir un interés pecuniario en un bien de su cliente, infringieron el Canon 21 el cual, entre otras cosas, le impone al abogado un deber de lealtad para con su cliente y le prohíbe la representación de un cliente cuando su juicio profesional podría verse afectado por sus intereses personales.

Como hemos señalado, la Oficina de Liquidación se creó para liquidar todos los activos y pasivos de la C.R.U.V. y utilizar el producto de dicha

liquidación para atender la <u>precaria</u> situación económica de esta última. Para cumplir con su tarea, la Oficina de Liquidación contrató a los querellados para que éstos le rindieran servicios profesionales y la representaran en <u>todos</u> los asuntos en que se tuviera que defender los derechos, obligaciones y prerrogativas de la oficina, según establecidos en su ley habilitadora. El propósito más importante de la Oficina de Liquidación era el de maximizar sus activos para, con su producto, poder cubrir sus pasivos. Éste era uno de los intereses que los querellados tenían que proteger en su labor como abogados de la entidad.

En el caso de autos, hubo una relación abogado-cliente entre los querellados y la Oficina de Liquidación. Del propio contrato de servicios profesionales se desprende claramente este hecho. Es más, era tan evidente la intención de la Oficina de Liquidación de crear una relación abogado-cliente, enmarcada dentro de los deberes de lealtad, fidelidad y confidencialidad que en el contrato de servicios profesionales se dispuso: "'EL BUFETE' se compromete, durante la vigencia de este contrato, a no aceptar la representación legal de partes con intereses en conflicto con los de 'LA OFICINA'".

Evidentemente, del texto del contrato se desprende que la Oficina de Liquidación tenía la expectativa de que los querellados asumieran la representación de sus asuntos legales y que, al amparo de dicha representación, no incurrirían en conflicto de intereses durante la vigencia de la relación abogado-cliente. Desde el otorgamiento del contrato se creó una relación abogado-cliente entre las partes, razón por la cual los querellados estaban sujetos a cumplir con las exigencias aplicables hasta que la misma finalizara.

Ciertamente, a la luz del contrato de servicios profesionales otorgado entre las partes, y a tenor con la ley habilitadora de la Oficina de Liquidación, resulta evidente que en caso de que dicha entidad tuviera que iniciar acciones legales para perseguir activos, resolver contratos o dilucidar la validez de los negocios llevados a cabo por ésta, los querellados serían los llamados a representarla y los encargados de velar por sus intereses.

Ante esta realidad parece meridianamente obvio que, cuando menos, los querellados debieron abstenerse de adquirir un interés pecuniario en un bien de su cliente. Esto pues, tal proceder sería adverso para su cliente en tanto comprometería seriamente el juicio profesional y el deber de lealtad que los querellados debían guardar. Una vez

los querellados adquirieran un interés sobre un activo de su cliente se reduciría, sustancialmente, su capacidad para considerar alternativas de cursos de acción que debían seguir en beneficio de éste. Véase, A.B.A., Annotated Model Rules of Profesional Conduct, *supra* a la pág. 94. Sin embargo, estando vigente estos contratos, los querellados aprovecharon su posición como abogados de la Oficina de Liquidación la cual ciertamente les daba acceso a información privilegiada, para diseñar un esquema empresarial y adquirir un interés pecuniario en un bien de su cliente.

Debido a que los querellados adquirieron un interés personal sobre uno de los bienes de su cliente, el ejercicio de su juicio profesional, en cuanto a la defensa de los intereses del cliente, estuvo contrapuesto al interés personal de los querellados de adquirir el bien al mejor precio posible. Sin embargo, no empece el patente conflicto de interés que se generaría, los querellados prosiguieron con sus planes, para adquirir la finca de Aguadilla y desarrollarla comercialmente para su beneficio personal. No podemos avalar su actuación.

En In re Toro Cubergé, *supra*, no sólo establecimos una norma dirigida a prohibir, de ordinario, las transacciones comerciales que un abogado realiza personal y directamente con su

cliente sino que advertimos, además, que un abogado no podría evadir los rigores éticos por el mero hecho de que realice una transacción comercial (o adquiera, a sabiendas, un interés pecuniario en un bien de su cliente) a través de una persona jurídica con la que estuviese relacionado. Aún en tales casos, cuando menos, se exige del abogado una <u>divulgación</u> amplia y robusta, análoga a la impuesta por las Reglas Modelos, sobre: la relación del abogado con la tercera persona, sus intereses en la transacción, cómo podía afectarse la relación abogado-cliente entre ellos, y la deseabilidad de que el cliente obtuviese consejo legal independiente de otro abogado con respecto a dicha transacción. Esto, por supuesto, parte de la premisa de que se trata de una transacción justa y razonable para el cliente.

En el caso de autos, los querellados no realizaron la transacción directa y personalmente con su cliente. A pesar de que es evidente que la única función de "Costa Mar" y "Express Realty" era hacer mediante terceros lo que los querellados no hubiesen podido hacer personalmente, no existe determinación del Comisionado que indique que las mismas fuesen un mero álter ego de los letrados.[23]

---

[23] Esto, por supuesto, a diferencia de la situación que atendimos en In re Toro Cubergé, *supra*, en

Sin embargo, el haber llevado a cabo la transacción mediante tales entidades <u>no</u> releva a los querellados de sus obligaciones éticas. Aún así, debían cumplir con los requisitos de <u>divulgación</u> señalados. La adquisición de la finca por parte de "Express Realty" para ser revendida a "Costa Mar" sin, tan siquiera, realizar divulgación alguna a la Oficina de Liquidación del <u>efecto</u> que tendría dicha transacción sobre la relación abogado-cliente, incide sobre los postulados éticos enunciados en <u>In re Toro Cubergé</u>, *supra*.

Los querellados, mientras eran abogados de la Oficina de Liquidación, a través de "Costa Mar" adquirieron un interés pecuniario sobre la finca en cuestión, propiedad de su cliente. Ambos querellados tenían un interés en dicha sociedad especial, que comprometía el deber ético que le debían a su cliente; el Lcdo. Morell Corrada por virtud de la sociedad ganancial, que era dueña de una tercera parte de "Costa Mar", y el Lcdo. Alcover García, no sólo por virtud de la participación de su esposa en "Costa Mar",[24] sino

---

donde fue admitido por el abogado allí querellado, y sustentado por la determinación de hecho del Comisionado, que no se trataba de una corporación auténtica sino de un simple álter ego. *Id.* a la pág. 533.

[24] Evidentemente, el deber de lealtad que tiene un abogado hacia su cliente puede comprometerse igualmente cuando los intereses de su pareja están

por la adquisición directa de la participación de la sociedad ganancial del Lcdo. Morell Corrada la cual adquirió posteriormente.

Del Informe del Comisionado Especial <u>no</u> se desprende que los querellados cumplieran con los requisitos de divulgación requeridos. Evidentemente, la escueta revelación hecha por el Lcdo. Alcover García a su cliente, (a los fines de informar que las esposas de los querellados participaban en "Costa Mar") es insuficiente para satisfacer el rigor de las normas éticas aplicables.

No se puede argüir, como hacen los querellados, que la Oficina de Liquidación estaba enterada de la situación cuando <u>nunca</u> se le advirtió del serio conflicto de interés ni se reveló cómo la transacción afectaría la relación abogado-cliente y cómo podría comprometerse el juicio independiente de los abogados. Más aún, no existe indicio alguno de que se orientara a la

---

envueltos. La relación íntima de una pareja está ligada a los intereses económicos, por lo que las actuaciones de uno directamente afectan al otro. Véase, por ejemplo, PA Eth. Op. 93-64, (7 de abril de 1993), 1993 WL 851191; New York State Bar Association Committee on Professional Ethics, Opinion 738 (16 de abril de 2001), http://www.nysba.org/Content/NavigationMenu/ Attorney_Resources/Ethics_Opinions/Ethics_Opinions. htm

Oficina de Liquidación sobre la deseabilidad de que un abogado externo analizara la situación.

Debemos puntualizar que el caso de autos no trata meramente de un bien de un cliente que de buenas a primeras, y por el mero tráfico accidentado del flujo de bienes en el comercio, llega a manos de una entidad en la que el abogado tiene un interés. Igualmente, tampoco estamos ante una transacción rutinaria entre un abogado y un cliente que se dedica a tales negocios.

Por el contrario, estamos ante un sofisticado esquema transaccional diseñado por unos abogados que se aprovecharon de su posición como letrados para obtener información sobre un bien de su cliente (una entidad gubernamental que se encontraba en una delicada situación económica) y así entrar en negocios con dicha entidad para adquirir el bien.

Los querellados aprovecharon su posición como abogados de la Oficina de Liquidación para su beneficio propio. En virtud de su posición como consejeros legales, los querellados, tenían acceso a información que de no ser por su posición no hubiesen obtenido. Aprovechándose de esta información, éstos adquirieron un interés en un bien del cliente, creando, al así hacerlo, una situación en donde los intereses del cliente y los

de los abogados podrían verse en conflicto, afectando, de esta manera, el juicio profesional de éstos y violentando el deber de confidencialidad enmarcado dentro del deber de lealtad que le debe todo abogado a su cliente.

El deber de lealtad para con el cliente, esbozado en el Canon 21, abarca el deber de confidencialidad que debe guardar el abogado para con los secretos de los clientes. Este deber incluye la no divulgación de la información obtenida como producto de la relación abogado-cliente. 4 L.P.R.A. Ap. IX P.III C.21. El abogado no puede utilizar esta información para beneficio propio pudiendo perjudicar, de esta manera, los intereses de su cliente los cuales es su deber defender.

Los querellados, del caso de autos, ostentaban una posición de consejeros legales de la Oficina de Liquidación y, por virtud de la misma, tenían acceso a información privilegiada de su cliente. La ventajosa posición de los querellados, como abogados de la referida oficina, los colocaba en la atípica situación de tener acceso a información del cliente mientras realizaban todo tipo de trámites para viabilizar la compra. Por tal razón, debemos enmarcar sus repetidos esfuerzos para viabilizar la transacción como lo que son; no meramente acciones

inocuas o triviales sino gestiones afirmativas dirigidas al perfeccionamiento y desarrollo de un negocio aprovechándose del acceso que tenían, en virtud de su posición como representantes legales, a información confidencial de una entidad pública que se dedicaba, no a la venta de bienes, sino a la maximización de recursos en beneficio del Pueblo de Puerto Rico.

La relación abogado-cliente que existía, y los deberes que por virtud de dicha relación se creaban, no cesan por el mero hecho de que los querellados no asesoraran a la Oficina de Liquidación sobre la transacción específica que generó el conflicto de interés, especialmente cuando a ésta no se le informó la relación de los abogados con la transacción. De hecho, ya desde In re Toro Cubergé, *supra*, a la pág. 534, habíamos advertido que tal hecho no era determinante. ("No importa aquí que el querellado no haya asesorado al [cliente] sobre la transacción aludida".) El deber de fidelidad y lealtad que los querellados le debían a su cliente se mantenía en pleno vigor aunque éstos no asesoraran a la Oficina de Liquidación sobre la conflictiva transacción que le proponían. El deber de fiducia para con el cliente se extiende aún cuando no se esté actuando como consejero legal en cuanto a la transacción

específica en cuestión. Véase, In re Spear, 774 P.2d 1335, 1342 (Ariz. 1989)("Furthermore, even when not acting as counsel in the precise transaction in question, an attorney owes his client a fiduciary duty[.]"); Iowa Supreme Court Bd. Of Ethics and Conduct v. Sikma, 553 N.W. 2d 532 (Iowa, 1995).

El hecho de que la venta del bien se haya realizado por un precio que superó en un veinte por ciento (20%) el valor de la tasación no significa que no se incurrió en un conflicto violatorio de las reglas éticas que rigen la profesión de la abogacía. El daño consistió en que la Oficina de Liquidación no tuvo asesoramiento independiente. En esta transacción, la entidad gubernamental no fue representada adecuadamente. Su derecho a una representación libre de todo conflicto de interés fue violentado. De la misma forma, fue violentado el deber de confidencialidad que le debe todo abogado a sus clientes, al éstos aprovechar su posición, como abogados de la entidad, para beneficio propio. Además, en la prueba vertida no hay indicio alguno de que el Lcdo. Morell Corrada y el Lcdo. Alcover García hayan apercibido a la entidad gubernamental del conflicto que acarreaba la transacción, ni que le hubiesen recomendado que contrataran representación legal independiente que

los asesorara en esta transacción. Por lo que quebrantaron su obligación de divulgar al cliente todas las circunstancias que pudieran afectar su juicio profesional independiente.  Es menester recordar que la existencia de un conflicto de intereses que requiere la imposición de  sanciones disciplinarias es aquella que, como en este caso, impide la representación libre y adecuada, por parte del abogado, y vulnera la lealtad absoluta que le debe todo abogado a su cliente. In re Belén Trujillo, *supra*, a la pág. 753.

La conducta violatoria del Canon 21, en este caso, se da precisamente por virtud de los efectos nocivos que dicha transacción tendría para la relación abogado-cliente; relación que existía desde mucho antes que se llevara a cabo la transacción y que requería de los querellados el abstenerse de incurrir en intereses encontrados con los de su cliente.  Por ello, los querellados no podían adquirir un interés pecuniario en un bien de su cliente y meramente argüir que, cómo no asesoraron al cliente sobre la transacción que generó el conflicto de interés, estaban eximidos de cumplir con el Canon 21. Esta postura  menoscabaría el efecto profiláctico del aludido Canon pues el mismo sólo aplicaría en la atípica situación en que un abogado "pacte" con su cliente para asesorarlo

precisamente sobre la viciada transacción que le propone.

En fin, las actuaciones de los letrados ponen de manifiesto la razón de ser del escepticismo que los tribunales han manifestado al pasar juicio sobre las transacciones comerciales entre abogados y sus clientes; transacciones que pueden ser utilizadas por abogados que aprovechan su posición para elaborar esquemas para su propio beneficio y en contra de los intereses de sus clientes. Es ésta una de esas instancias, y en ausencia de tan siquiera cumplir con los requisitos de divulgación básicos, no procede validar las actuaciones de los querellados.

De otra parte, el proceder del Lcdo. Alcover García, al otorgar la escritura de compraventa entre la Oficina de Liquidación y "Express Realty", denota serias violaciones adicionales. Sabido es que un notario tiene el deber de asesorar, ilustrar y dar consejo legal a todas las partes contratantes para que comprendan los efectos y las consecuencias jurídicas del negocio celebrado. El notario representa la fe pública y está llamado a ser imparcial con todos los otorgantes del instrumento que autorice. Precisamente, hemos afirmado que el notario se destaca como un "funcionario imparcial, que recibe, expone y legitima la voluntad de los

que ante él comparecen sin tomar bando, sin inclinarse a un lado u otro". In re Cancio Sifre, 106 D.P.R. 386, 396 (1977). Su obligación de orientar y advertir ha de desplegarse para todos por igual, con imparcialidad. Incluso, hemos precisado que no basta ser imparcial, también hay que aparentarlo. Véase, In re Sepúlveda Girón, res. el 24 de octubre de 2001, 2001 TSPR 153; In re Colón Muñoz, 131 D.P.R. 102 (1992); In re Cancio Sifre, *supra*.

No obstante, en amplia contravención a estos postulados, el Lcdo. Alcover García otorgó la referida escritura cuando precisamente había montado un esquema para adquirir el bien objeto del negocio jurídico que autorizaba. Difícilmente el querellado podía cumplir con los deberes de imparcialidad y de asesoría que se le imponen cuando su proceder iba dirigido a despojar a la Oficina de Liquidación de la finca de Aguadilla para su beneficio personal. Ciertamente, su interés en el negocio jurídico sobre el que daba fe le impedía guardar imparcialidad alguna. De hecho, el Lcdo. Alcover García ya había tomado "bando"; inclinándose totalmente del lado del Sr. Ángelo Medina (principal accionista de "Express Realty"), un simple testaferro suyo por virtud de quien pretendía evadir el rigor ético al que estaba

sujeto. Su actuación, no obstante, no puede ser excusada.

Igualmente, somos del criterio que la conducta de los querellados incide sobre la "apariencia de impropiedad" vedada por el Canon 38 de Ética Profesional[25] y por el propio contrato de servicios profesionales otorgado entre las partes. La apariencia de impropiedad puede ser muy lesiva al respeto de la ciudadanía por sus instituciones y a la confianza que los clientes depositan en sus abogados. Véase, In re Ortiz Brunet, res. el 22 de noviembre de 2000, 2000 T.S.P.R. 170, In re Rojas Lugo, 114 D.P.R. 687, 690 (1983). El abogado tiene el deber de ejercer un criterio profesional independiente y libre de influencias extrañas a su gestión profesional. En el descargo de sus responsabilidades profesionales, debe cuidarse de que sus actuaciones no den margen a la más leve sospecha de que promueve intereses suyos encontrados con los de su cliente. In re Toro Cubergé, supra a la pág. 532. En el caso de autos, la apariencia de impropiedad era tal que el propio

---

[25] El referido Canon dispone en parte:
"El abogado deberá esforzarse, al máximo de su capacidad, en la exaltación del honor y dignidad de su profesión, aunque el así hacerlo conlleve sacrificios personales y debe evitar hasta la apariencia de conducta profesional impropia." 4 L.P.R.A. Ap. IX, C.38.

Lcdo. Morell Corrada lo reconoce y por esto decide desvincularse del negocio y vender su participación en "Costa Mar".

Evidentemente, el proceder de los querellados al diseñar un esquema empresarial para adquirir un bien de su cliente creó una apariencia de conducta impropia que transgrede el Canon 38 y violenta el contrato de servicios profesionales. A todas luces era patente la impropiedad de la conducta, y la explotación de la relación profesional con una entidad gubernamental para fines personales.

La Oficina de Liquidación delegó en los querellados la importante y honrosa tarea de representar el interés público mediante el ejercicio de sus habilidades profesionales; habilidades que en lugar de haber sido ejercidas para defender y enaltecer la precaria situación fiscal de una entidad gubernamental, fue utilizada para tejer un esquema para adquirir un interés en un bien de su cliente. La oportunidad de exaltarse mediante el humilde ejercicio de sus capacidades legales en beneficio del bien público fue, cuando menos, desaprovechada. En su lugar, los querellados gestionaron activamente adquirir un interés pecuniario en un bien de su cliente, comprometiendo de esta manera su juicio profesional independiente.

Por ende, procede decretar la suspensión inmediata de los querellados por el término de un (1) año del ejercicio de la abogacía la cual durará hasta que este Tribunal autorice su readmisión. La gravedad y seriedad de la conducta de los querellados y el conflicto tan patente en que incurrieron, no justifica que limitemos nuestra sanción a una mera censura formal como hicimos en In re Toro Cubergé, *supra*. La actuación de los querellados lesiona intereses de la más alta jerarquía en la medida que atentó contra la salud fiscal de una entidad gubernamental y puso en juego su adecuada representación; todo esto socavando la confianza pública en sus instituciones.

Debemos recordar que el esquema empresarial articulado fue ejercido, precisamente, en contra de una entidad gubernamental creada para atender la precaria situación económica de la C.R.U.V. y cuya función era cumplir con el mayor número de responsabilidades financieras utilizando sus propios recursos. Más aún, por disposición expresa de ley, los propósitos para los cuales se creó la Oficina de Liquidación constituían "propósitos públicos" para el beneficio del Pueblo de Puerto Rico y el ejercicio de los mismos constituía el cumplimiento de "funciones gubernamentales esenciales". La explotación de la relación

profesional con una entidad pública para beneficios personales denota una conducta que este Tribunal debe reprochar. Nuestro país requiere transparencia en sus instituciones y los abogados que representan al interés público tienen la responsabilidad de evitar que su criterio profesional pueda ser afectado por intereses personales.

Por último, los querellados notificarán a sus clientes que por motivo de la suspensión no pueden continuar con su representación legal y devolverán a éstos los expedientes de los casos pendientes y los honorarios recibidos por trabajos no realizados. Asimismo, informarán de su suspensión a cualquier sala del Tribunal General de Justicia o a cualquier foro administrativo donde tengan algún caso pendiente. Por último tienen la obligación de acreditar y certificar ante este Tribunal, en el término de treinta (30) días que se cumplió con lo antes señalado. El cumplimiento de estos deberes, deberá ser notificado también al Procurador General. El Alguacil de este Tribunal se incautará inmediatamente de las obras y sellos notariales de los querellados, para el trámite correspondiente por la Directora de la Oficina de Inspección de Notarías.

Se dictará la Sentencia correspondiente.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

In re:

Marcos Morell Corrada          CP-97-15
José Alcover García

SENTENCIA

San Juan, Puerto Rico, a 5 de marzo de 2003.

Por los fundamentos antes expuestos en la Opinión Per Curiam que antecede, la cual se hace formar parte íntegral de la presente, se dicta Sentencia y se suspende inmediatamente a los Lcdos. Marcos Morell Corrada y José Alcover García del ejercicio de la profesión legal por el término de un (1) año, contado a partir de la fecha de notificación de la presente hasta que otra cosa disponga este Tribunal.

El Tribunal le impone a los Lcdos. Morell Corrada y Alcover García el deber de notificar a todos sus clientes de su presente inhabilidad de seguir representándolos, les devuelva cualesquiera honorarios recibidos por trabajos no realizados, e informe oportunamente de su suspensión a los distintos foros judiciales y administrativos del país. Por último, tienen la obligación de acreditar y certificar ante este Tribunal, en el

término de treinta (30) días, contados a partir de
la notificación de la presente, que se cumplió con
lo antes señalado.    El cumplimiento con estos
deberes deberá ser notificado también al Procurador
General.

Se ordena a la Oficina del Alguacil que
incaute de la obra y sello notarial de ambos

abogados para que sean remitidas, examinadas y oportunamente objeto de un Informe por parte de la Oficina de Inspección de Notarías.

Así lo pronunció y manda el Tribunal y certifica la Secretaria del Tribunal Supremo.  Todos los Jueces que intervienen lo hacen por Regla de Necesidad.  El Juez Asociado señor Rivera Pérez disintió con Opinión escrita.  El Juez Asociado señor Corrada del Río se inhibió.

Patricia Otón Olivieri
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

In re:

| | | |
|---|---|---|
| Marcos Morell Corrada | | Conducta |
| José Alcover García | CP-97-15 | Profesional |

Opinión Disidente emitida por el Juez Asociado señor Rivera Pérez.

San Juan, Puerto Rico, a 5 de marzo de 2003.

El presente procedimiento disciplinario se inició con la presentación de una queja por parte del licenciado Aníbal Acevedo Vilá contra los licenciados Marcos A. Morell Corrada y José B. Alcover García. Referimos la misma al Procurador General para investigación e informe. Evaluado el informe presentado, instruimos al Procurador General para que presentara las querellas correspondientes. Presentadas las mismas, los letrados querellados presentaron sus respectivas contestaciones. Designamos un Comisionado Especial para que presidiera las vistas

evidenciarias, y recibiera la prueba que tuvieran a bien presentar las partes. Los hechos que a continuación esbozamos están basados en el

expediente del Tribunal, en la grabación de la prueba desfilada en las vistas evidenciarias y en las determinaciones de hechos a las que llegara el Comisionado Especial. Estamos ante un complejo y extenso trasfondo fáctico.

La Mayoría determina disciplinar a los querellados, licenciados Marcos Morell Corrada y José Alcover García, por violaciones a los Cánones de Ética Profesional. Concluyó, además, que el licenciado Alcover García violó las disposiciones de la Ley Notarial. DISENTIMOS.


I

Los hechos que enmarcan el presente procedimiento disciplinario están relacionados con el vínculo profesional, de naturaleza contractual, de las distintas firmas de abogados a las que pertenecieron los aquí querellados, con la Oficina para la Liquidación de las Cuentas de la Corporación de Renovación Urbana y Vivienda,[26] en adelante la Oficina. Por su importancia respecto a la querella ante nuestra consideración, es necesario describir cronológicamente el historial de las referidas firmas de abogados. Veamos.

Desde el año 1993, hasta principios del año 1996, los licenciados Morell Corrada y Alcover García fueron socios de distintas firmas legales.[27] Las firmas legales a las que pertenecieron los referidos letrados fueron las siguientes: Morell, Pérez Preston & Alcover, en adelante Bufete I; Morell, Morell & Alcover, en adelante Bufete II, y el Bufete Morell & Alcover, en adelante Bufete III. Cada uno de estos surgió de manera cronológica por razón de la disolución del anterior.

---

[26] La Ley Núm. 55 de 9 de agosto de 1991, 1991 (Parte I) Leyes de Puerto Rico 232-243, disolvió la Corporación de Renovación Urbana y Vivienda (C.R.U.V.) y creó la Oficina para la Liquidación de las Cuentas de la C.R.U.V. Dicha Oficina estaría a cargo de la liquidación de todos los activos de la referida corporación, de modo que pudiera cumplir con las obligaciones financieras de ésta. Para la consecución de tales objetivos, la referida ley creó la Oficina para la Liquidación de las Cuentas de la C.R.U.V. Posteriormente, el 30 de junio de 1998, se aprobó la Ley Núm. 106, la cual ordenó el cierre de la Oficina, 17 L.P.R.A. sec. 27aa et seq. La referida Ley Núm. 106, supra, derogó tácitamente la Ley Núm. 55, supra.

Durante la vigencia de los contratos con la Oficina, los licenciados Morell Corrada y Alcover García, mediante los Bufetes II y III, suscribieron acuerdos, y contratos de servicios profesionales con otras entidades gubernamentales, específicamente en el período del 1ro. de julio de 1993 hasta el 30 de junio de 1994.[28]  Dichas entidades fueron el Banco Gubernamental de Fomento, y el Banco y Agencia de Financiamiento de la Vivienda, en adelante Banco de la Vivienda.[29]

El Bufete I suscribió un contrato con el Departamento de Hacienda, que tuvo vigencia entre el 1ro. de febrero de 1993 y el 30 de junio de 1993.[30]  Del análisis detenido de la prueba estipulada por todas las partes surge que la vigencia de este contrato no coincidió con la vigencia de ninguno de los contratos suscritos por el Bufete II y el Bufete III con la Oficina del Síndico, los cuales describiremos más adelante.[31]

---

[27] Informe Conjunto de Conferencia con Antelación a la Vista, pág. 11.

[28] Informe Conjunto de Conferencia con Antelación a la Vista, pág. 11.

[29] Exhibits Estipulados Núms. 16, 17, 18 y 27.

[30] Este contrato fue suscrito por el Bufete I, con el propósito de organizar la Oficina de Fraude Contributivo del Departamento de Hacienda.  Contrato número 93-000061, Estipulación de Hechos número 20, Informe Conjunto de Conferencia con Antelación a la Vista, pág. 11; testimonio del licenciado Morell Corrada en la vista oral de 9 de noviembre de 1999.

[31] Erró el Comisionado Especial al concluir que el contrato con el Departamento de Hacienda (Contrato número 93-000061) confligió con el contrato con la Oficina durante los meses de mayo y junio de 1993. (Véase, Informe del Comisionado Especial, pág. 34).  Ello, a pesar de que la prueba estipulada por las partes demuestra que **no hubo conflicto** entre el contrato con el Departamento de Hacienda y el contrato con la Oficina, y a pesar de que en la vista el Procurador General no argumentara oralmente ni desfilara prueba alguna que indicara que el contrato con el Departamento Hacienda confligió de algún modo con el contrato con la Oficina.  (Informe Conjunto de Conferencia con Antelación a la Vista, págs. 11-12; vista oral del 8 al 10 de noviembre de 1999).  Al examinar las fechas de vigencia de los referidos contratos encontramos que no confligían.

El Comisionado Especial consignó en su informe que "el primer contrato entre el Bufete y la Oficina" (el cual denominó **94-SE-0003**) se había otorgado el **8 de mayo de 1993**, cuando **no existe ningún contrato** que se haya suscrito en dicha fecha.  (Informe del Comisionado Especial, pág. 14; Informe Conjunto de Conferencia con Antelación a la Vista, págs. 11-12)  De la prueba documental estipulada por las partes, así como de la grabación de la vista ante el Comisionado Especial, surge que el Bufete Morell, Morell y Alcover (Bufete II) suscribió un contrato de servicios profesionales con la Oficina, cuya vigencia fue

De la prueba estipulada por todas las partes surge que el Bufete I contrató con el Banco de la Vivienda para brindarle servicios a la Oficina del Síndico exclusivamente.[32] A dicho contrato se le asignó el número 94-000002. El mismo se dejó sin efecto a principios de agosto de 1993, cuando se disolvió el Bufete I, porque el licenciado Pérez Preston había abandonado la referida firma legal.[33] Ello implicó que, el 6 de agosto de 1993, se suscribiera un nuevo contrato, ahora entre el Bufete II y el Banco de la Vivienda, (94-00002-Z).[34] Este contrato tenía el mismo propósito que el anterior.[35]

El 1 de julio de 1993, el Bufete II representado por el licenciado Alcover García, aquí querellado, había otorgado un contrato de

---

del 1 de julio de 1993 hasta el 30 de junio de 1994. (Exhibit 21 de la prueba documental estipulada) El mismo tiene el número 93-SE-0021.

En una certificación de la Oficina del Contralor que fue estipulada por las partes surge que en dicha oficina aparece registrado el contrato entre el Bufete Morell, Morell y Alcover y la Oficina con el número 94-SE-0003. (Prueba documental estipulada, pág. 155) No obstante, la vigencia de dicho contrato coincide con la del contrato que se estipuló por las partes y al cual se hizo alusión durante la vista ante el Comisionado Especial (93-SE-0021), por lo que la conclusión del Comisionado es incorrecta, ya que el contrato con el Departamento de Hacienda expiró el 30 de junio de 1993 y el primero con la Oficina entró en vigor el 1 de julio de 1993. (Prueba documental estipulada, págs. 155 y 160) Podemos notar que los contratos 93-SE-0021 y el 94-SE-0003 son un solo contrato, porque se trata de las mismas partes y la misma fecha de vigencia. No se aportó prueba alguna por ninguna de las partes que estableciera que se trató de contratos distintos. Ambos contratos tenían el mismo propósito, prestarle iguales servicios profesionales a la Oficina durante el mismo período de tiempo.

[32] Exhibit Estipulado Núm. 16, pág. 102; Informe del Comisionado Especial, págs. 15-16. Este contrato tenía el mismo propósito que el 93-SE-0021, el de prestar servicios profesionales a la Oficina.

[33] Exhibit Estipulado Núm. 27, págs. 138 y 144; Testimonio del licenciado Morell Corrada en la vista oral celebrada el 9 de noviembre de 1999.

[34] A pesar de que la estipulación de hechos de las partes y la certificación estipulada de la Oficina del Contralor disponen que la vigencia de este segundo contrato (94-000002-Z) fue del 2 de julio de 1993 al 30 de junio de 1994, de la faz del contrato surge que su vigencia fue del 6 de agosto de 1993 hasta el 30 de junio de 1994, por lo que prevalece esta última. Es necesario resaltar que a este segundo contrato se le dio el número 94-000002-Z en la estipulación de hechos de las partes y en la certificación estipulada de la Oficina del Contralor. Sin embargo, de la faz del contrato surge que su número correcto es 94-000004. Exhibit Estipulado Núm. 27, págs. 138-142.

[35] Informe del Comisionado Especial, pág. 16.

servicios profesionales directamente con la Oficina, la cual estaba representada por el Síndico Especial, en aquel entonces, el licenciado Antonio J. Cabrero Muñiz.[36]

Por existir una relación contractual directa entre el Bufete II y la Oficina, la referida firma de abogados concluyó que era innecesario mantener la relación contractual existente con el Banco de la Vivienda, porque ambos contratos tenían idéntico fin, rendirle servicios a la Oficina.[37] Así se lo comunicaron a la licenciada Mildred I. Goyco de Maldonado, presidenta de dicho banco, en una misiva fechada el 15 de diciembre de 1993.[38] Aceptada por la señora Goyco la solicitud hecha por dicho Bufete, se efectuó la resolución del contrato con el Banco de la Vivienda (94-000002-Z).[39]

En adición a los contratos suscritos con la Oficina, el Bufete II otorgó dos (2) acuerdos denominados "contratos de servicios profesionales" con el Banco Gubernamental de Fomento.[40] Estos acuerdos fueron consecutivos y su vigencia comprendía desde el 15 de junio de 1993 hasta el 30 de junio de 1994.[41] La finalidad de los mismos era la de precualificar la referida firma de abogados y notarios para que pudiera

---

[36] Contrato de servicios profesionales, contrato número 93-SE-0021. La vigencia del mismo era desde el 1 de julio de 1993 hasta el 30 de junio de 1994. Véase, Exhibit Estipulado Núm. 21, págs. 112-116.

[37] Exhibit Estipulado Núm. 16, pág. 102.

[38] Íd.

[39] Ese contrato tenía vigencia desde el 6 de agosto de 1993 hasta el 30 de junio de 1994. (Exhibit 27 de la Prueba Documental estipulada, págs. 137-142). Dicho contrato fue resuelto el 16 de diciembre de 1993, mediante documento titulado "Resolución de Contrato de Servicios Profesionales", en el cual comparecieron la señora Mildred I. Goyco de Maldonado, en representación del Banco y Agencia de Financiamiento de la Vivienda de Puerto Rico, y el licenciado Alcover García, en representación de Morell, Morell & Alcover. Exhibit Estipulado Núm. 17, págs. 103-104.

[40] Informe del Comisionado Especial, pág. 16.

[41] El primero (93-BGF-110) tuvo vigencia del 15 de junio de 1993 hasta el 30 de junio de 1993, y el segundo (93-BGF- 111) del 1 de julio de 1993 hasta el 30 de junio de 1994. Estipulación de Hechos número 20, Informe Conjunto de Conferencia con Antelación a la Vista, pág. 11.

notarizar los documentos de sus clientes privados, que realizaran negocios o transacciones con el Banco Gubernamental de Fomento.[42]

Bajo los referidos acuerdos con el Banco Gubernamental de Fomento, los letrados aquí querellados no rindieron servicios a la referida corporación.[43] El 15 de diciembre de 1993, el licenciado Alcover García, en representación del Bufete II, envió un comunicado al licenciado Marcos A. Rodríguez Emma, Presidente del Banco Gubernamental de Fomento, solicitándole que dejara sin efecto el acuerdo entre ambos.[44]

Posteriormente, el 29 de junio de 1994 pactaron con la Oficina del Síndico Especial otro contrato de servicios profesionales (contrato número 94-SE-0003-A) con vigencia desde la fecha de su otorgamiento y finalizando el 30 de junio de 1995, el cual era una renovación del primer contrato firmado con la Oficina (93-SE-0021).[45] El 9 de octubre

---

[42] Informe del Comisionado Especial, pág. 16. Aunque el Comisionado Especial adjudicó este hecho, en su informe no consignó los pormenores de la naturaleza de este acuerdo entre el Bufete II y el Banco Gubernamental de Fomento. No obstante, las vistas evidenciarias nos permitieron ilustrarnos sobre este aspecto. El licenciado Morell Corrada explicó que debido a la naturaleza de los negocios de algunos de los clientes del Bufete, existía la posibilidad que en algún momento necesitaran solicitar financiamiento del Banco Gubernamental de Fomento. En cuyo caso, los únicos abogados que pueden en calidad de notarios firmar y notarizar documentos con el Banco Gubernamental de Fomento son aquellos abogados o firmas que estén precualificadas con el referido banco. Por esta razón el Bufete II le sometió sus credenciales a dicha entidad bancaria, **sin que estuviera estableciéndose un vínculo profesional contractual de abogado y cliente entre el Bufete II y el Banco Gubernamental de Fomento**, sino para poder notarizar documentos relacionados con transacciones de la misma, como parte de las gestiones con sus clientes. Este acuerdo con el Banco Gubernamental de Fomento, cualificaba al referido Bufete II para que en un futuro pudiera prestarle servicios a un cliente suyo que quisiera hacer una transacción con dicha entidad bancaria. La Oficina del Procurador General no presentó prueba para evidenciar que existiera una relación contractual entre los querellados y el Banco Gubernamental de Fomento. Tampoco controvirtió o refutó la presentada por los querellados. Informe del Comisionado Especial, pág. 16; testimonio del licenciado Morell Corrada en la vista oral celebrada el 9 de noviembre de 1999.

[43] Informe del Comisionado Especial, pág. 16.
[44] Íd.

[45] Contrato Número 94-SE-0003-A. Exhibit Estipulado Núm. 22, págs. 117-122. Aunque las partes estipularon que la fecha de vigencia del contrato era retroactiva al 29 de abril de 1994, de la faz del contrato surge que su vigencia transcurría desde el día de su otorgamiento (29

de 1995 las mismas partes renovaron el referido contrato por un término contractual desde el 1ro. de julio de 1995 hasta el 30 de junio de 1996 (contrato número 94-SE-0003-B), para ofrecer los mismos servicios profesionales que el anterior contrato.[46]

Entre las cláusulas de los contratos celebrados entre los Bufetes II y III y la Oficina,[47] para efectos de los cargos presentados, se destacan las siguientes:

> ---**PRIMERA:-** **"EL BUFETE"** representará en los Tribunales o en las Agencias Administrativas del Estado Libre Asociado de Puerto Rico o de los Estados Unidos a **"EL SINDICO"**, o a **"LA OFICINA"** o a sus empleados, en todos aquellos casos o asuntos que por razón del cumplimiento de las funciones y responsabilidades que le asigna la Ley Número 55, aprobada el nueve (9) de agosto de Mil Novecientos Noventa y Uno (1991) que crea **"LA OFICINA"**, <u>sean demandados o traídos ante dichos foros, o que sea necesario a éstos comparecer para defender los derechos, obligaciones y prerrogativas que le asigna la Ley</u> y que **"EL SINDICO"** les refiera. **"EL BUFETE"** asumirá la representación legal de **"EL SINDICO"** y de la **"LA OFICINA"** <u>en todo proceso de Ejecución de Hipoteca y/o Resolución de Contrato</u> que se refiera y/o haya sido instado ante los Tribunales o Agencias del Estado Libre Asociado o de los Estados Unidos.----------------------------
>
> ---**SEGUNDA:-** Además, **"EL BUFETE"** se compromete y obliga a prestar sus servicios profesionales como abogado de la **"LA OFICINA"** asumiendo la representación legal de ésta ante los Tribunales de Justicia de Puerto Rico en relación al <u>cobro extrajudicial y judicial (entiéndase ejecuciones de hipoteca) de todos aquellos préstamos hipotecarios</u> que **"LA OFICINA"** le refiera <u>y acciones civiles</u> y así se compromete a realizar todos los trámites necesarios para lograr tal representación.--------------------------------
>
> ...
>
> ---**DECIMO OCTAVA:-** **"EL BUFETE" se compromete, durante la vigencia de este Contrato, a no aceptar la representación de partes con intereses en conflicto con los de "LA OFICINA".**
>
> ---**DECIMO NOVENA:-** La parte contratada reconoce que en el descargo de su función profesional tiene un deber de lealtad completa hacia la Agencia, lo que incluye el no tener intereses adversos a dicho organismo gubernamental. **Estos intereses adversos incluyen la representación de clientes que tengan o pudieran tener intereses encontrados con la parte contratante.** Este deber, además, incluye <u>la obligación continua de divulgar a la agencia todas las circunstancias de sus relaciones con clientes y terceras personas y cualquier</u>

---

de junio de 1994) hasta el 30 de junio de 1995. Este dato está apoyado, además, por la certificación de la Oficina del Contralor estipulada por las partes. (Prueba documental estipulada, pág. 155).

[46] Exhibit Estipulado Núm. 23, págs. 123-128.

[47] Exhibits Estipulados del 21 al 24.

**interés que pudiere influir en la agencia al momento de otorgar el Contrato o durante su vigencia.**

**La parte contratada representa intereses encontrados cuando, en beneficio de un cliente es su deber promover aquello a que debe oponerse en cumplimiento de sus obligaciones para con otro cliente anterior, actual o potencial. Representa intereses en conflicto, además, cuando su conducta es descrita como tal en las normas éticas reconocidas a su profesión, o en las leyes y reglamentos del Estado Libre Asociado de Puerto Rico.**

En contratdos [sic] con sociedades o firmas constituirá una violación de esta prohibición el que alguno de sus directores, asociados o empleados incurra en la conducta aquí descrita. La parte contratada evitará aún la apariencia de la existencia de intereses encontrados. (Énfasis nuestro.)

Las cláusulas antes citadas son comunes en todos los contratos otorgados entre las firmas de abogados (Bufetes I, II y III) y el Banco de la Vivienda, y posteriormente la Oficina. El propósito de esos contratos era ofrecer los mismos servicios profesionales a la Oficina en forma continua durante periodos subsiguientes. El Bufete III suscribió subsiguientes contratos de servicios profesionales directamente con la Oficina, hasta que se disolviera la referida sociedad profesional el 31 de enero de 1996.[48]

Como indicáramos anteriormente, los hechos que originan el presente procedimiento disciplinario surgen durante la relación profesional, de naturaleza contractual, directamente entre el **Bufete III** y la Oficina, específicamente durante los años de 1994 a 1995.[49]

---

[48] Exhibits Estipulados Núm. 22 y 23.

[49] El quejoso, licenciado Aníbal Acevedo Vilá, alegó, sobre la relación contractual de naturaleza profesional entre los querellados y la Oficina lo siguiente:

El Bufete Morell y Alcover prestaba servicios legales mediante contrato con la Oficina del Síndico Especial para la Liquidación de las Cuentas de la CRUV, entidad creada por virtud de la Ley Núm. 55 de 9 de agosto de 1991 (17 L.P.R.A. Secs. 27 et seq). Dicho contrato fue suscrito conforme a lo establecido por el Artículo 12 de la ley[,] el cual autoriza al Síndico Especial a contratar los servicios necesarios para la tramitación de los asuntos legales relacionados con el desempeño de sus funciones. (17 L.P.R.A. Sec. 27K). Dicho contrato establecía el deber del Bufete Morell y Alcover de prestar los servicios legales necesarios para cumplir con las funciones y responsabilidades de la Oficina del Síndico Especial. En la actualidad los servicios prestados ––además de asesoramiento legal según lo establecido en la Cláusula

El 14 de enero de 1991, se inscribió en el Departamento de Estado la corporación Express Realty, Inc., en lo adelante "Express Realty", de la cual fueron incorporadores el señor Angelo Medina Mercado, el señor Angelo Medina Acevedo y la señora Zulma Rivera Pagán.[50] Ni en ese momento, ni en ninguno otro posterior a la creación de Express Realty, los letrados querellados tuvieron participación o interés de clase alguna en dicho ente corporativo.[51]

El 27 de enero de 1994, el señor Angelo Medina Mercado, principal accionista de Express Realty, envió un comunicado a la Oficina manifestando su interés en adquirir una finca de 8.0399 cuerdas, ubicada en el Barrio Caimital del Municipio de Aguadilla, una de las propiedades bajo el control de la Oficina.[52] Desde 1989, el señor Angelo Medina Mercado era propietario de un predio de terreno en el Barrio Caimital de Aguadilla, el cual colindaba con la propiedad perteneciente a la C.R.U.V.[53] El interés del señor Medina Mercado en adquirir la referida finca de la C.R.U.V., obedecía a que su propiedad estaba enclavada, y de esta forma podría lograr acceso a la vía pública.[54]

---

Primera-- incluyen aquellos relacionados con transacciones de bienes inmuebles, de cuya actividad se puede obtener información sobre la disponibilidad para la venta de terrenos de la CRUV. El contrato, en su Cláusula Decimonovena, establece que la parte contratada no podrá tener intereses encontrados con la Oficina del Síndico. Dispone, además, la existencia de un deber de divulgar a la agencia cualquier interés o circunstancia con terceras personas que puedan presentar conflictos. También dispone que la parte contratada evitará aún la apariencia de intereses encontrados en los asuntos relacionados con el contrato. (Nota al calce omitida.)

[50] Informe del Comisionado Especial, pág. 17, Estipulación de Hechos número 2, Informe Conjunto de Conferencia con Antelación a Vista, pág. 7. Véase, además, Exhibits Estipulados Núms. 7 y 32, págs. 31 y 169-173.

[51] Informe del Comisionado Especial, págs. 17 y 32.

[52] Exhibit Estipulado Núm. 8, pág. 35.

[53] Informe del Comisionado Especial, pág. 17.

[54] Exhibit Estipulado Núm. 3, pág. 12; Exhibit Estipulado Núm. 10, pág. 93.

El 31 de enero de 1994, la Oficina le contestó al señor Medina Mercado su misiva, indicándole que tan pronto recibieran el informe de la nueva tasación se comunicarían con él y evaluarían su propuesta para adquirir la propiedad.[55] La Oficina se refería a la tasación realizada el 9 de diciembre de 1993 por el señor Miguel Ruiz de Jesús. Dicha tasación concluyó que el valor de la finca de 8.0399 cuerdas ascendía a la suma de doscientos cuarenta y un mil doscientos dólares ($241,200).[56]

Coetáneamente con las gestiones realizadas por el señor Medina Mercado, una corporación de nombre H.I. Development gestionaba con la Oficina la compra de la finca en cuestión para el desarrollo de un hotel.[57] No obstante, aunque fue la intención de la Oficina el dar preferencia a esta entidad, en atención a sus fines turísticos, su oferta de doscientos ocho mil quinientos dólares ($208,500) estaba **un trece por ciento (13%) por debajo del valor en el mercado, concluido por la referida tasación**.[58] Mediante comunicación de 5 de julio de 1994, el Subsíndico rechazó la oferta de H.I. Development por considerar inaceptable el precio ofrecido.[59]

Luego de varias comunicaciones, el señor Medina Mercado, como presidente de Express Realty, y el señor Arturo Paz Guzmán, como Subsíndico de la Oficina, suscribieron el 7 de julio de 1994 un contrato con opción a compra por la cantidad de trescientos mil dólares ($300,000) para la adquisición de la referida finca.[60] Se estipuló que el término de dicho contrato de opción de compra sería de noventa (90) días, a partir de su otorgamiento.[61] **El precio de venta pactado por**

---

[55] Exhibit Estipulado Núm. 3, pág. 12 y Exhibit Estipulado Núm. 9, págs. 36-89.

[56] Exhibit Estipulado Núm. 9, pág. 86.

[57] Informe del Comisionado Especial, pág. 18.

[58] Exhibit V del Procurador General, págs. 237, 243, 341-346.

[59] Íd., pág. 237.

[60] Exhibit Estipulado Núm. 10, págs. 92-95.

**Express Realty y la Oficina superaba el valor de tasación en aproximadamente un veinte por ciento (20%).** La cantidad ofrecida por Express Realty era de noventa mil y un mil dólares ($91,000), más que lo ofrecido por H.I. Development.[62]

A solicitud de la Oficina, el 21 de julio de 1994, el agrimensor Benigno Rodríguez Burgos preparó un plano de mensura, donde la finca de 8.0399 cuerdas opcionada resultó que tenía **una cabida real de 7.9097 cuerdas.**[63] Por virtud de dicha mensura, el agrimensor produjo un plano que reflejó la existencia de cinco parcelas dentro de la referida finca, la parcela B-2 de 4.9914 cuerdas; la parcela B-2-A de 1.8470 cuerdas; la parcela B-2-B de 0.2531 cuerdas; la parcela B-2-C de 0.2327 cuerdas y la parcela B-2-D de 0.5855 cuerdas.[64]

Las primeras dos (B-2 y B-2-A) configuraban el terreno a ser vendido por la Oficina, y las restantes tres parcelas, ya estaban dedicadas a fines públicos. Específicamente, la parcela B-2-B estaba destinada a facilidades recreativas, la parcela B-2-D a uso público y la B-2-C a las facilidades de la Autoridad de Acueductos y Alcantarillados.

El 22 de agosto de 1994 la Junta Ratificadora de la Oficina para la Liquidación de las Cuentas de la Corporación de Renovación Urbana y Vivienda de Puerto Rico, en adelante la Junta Ratificadora, organismo creado por ley para ratificar las ventas negociadas por la Oficina,[65] aprobó la venta de las dos parcelas a Express Realty.[66]

---

[61] Íd.

[62] Exhibits Estipulados Núm. 9 y 10; Exhibit V del Procurador General, págs. 237 y 243; Informe del Comisionado Especial, pág. 18.

[63] Exhibit V del Procurador General, pág. 344; Exhibit Estipulado Núm. 5, págs. 22-23.

[64] Exhibit Estipulado Núm. 5, págs. 22-23.

[65] 17 L.P.R.A. sec. 27.

[66] Exhibit V del Procurador General.

Luego de que la Junta Ratificadora hubiese aprobado la referida venta, la Oficina le asignó el caso de Express Realty al licenciado Alcover García para que actuara como notario en el mismo.[67] La función de notario del licenciado Alcover García no estaba comprendida dentro de los contratos de servicios profesionales entre los Bufetes II y III y la Oficina.[68] Sin embargo, era común que la Oficina le asignara casos a alguno de los notarios, miembros de las firmas de abogados con las cuales sostenían relaciones profesionales, para realizar funciones notariales como las de otorgar escrituras de rectificación de cabida, de colindancias, o de segregación de predios sobre los cuales ya se había ratificado su venta.[69] En cumplimiento de estos deberes notariales, el 23 de noviembre de 1994, el licenciado Alcover García solicitó la realización de un estudio de título de la propiedad opcionada por Express Realty. Dicho estudio fue pagado por el Síndico y quedó archivado en el expediente del caso en poder de la Oficina.[70]

Luego de una extensión del plazo para ejercer la opción, Express Realty solicitó el 20 de enero de 1995 un ajuste en el precio, debido a la reducción de cabida del predio opcionado, la cual surgió de la mensura practicada en julio de 1994 y la segregación de la finca original en cinco (5) parcelas, de las cuales sólo dos (2) configurarían el terreno a venderse.[71] Las restantes tres (3) parcelas se destinarían para el uso de entidades gubernamentales que ya estaban disfrutando de esos terrenos.[72] Como consecuencia de ello, de las 8.0399 cuerdas objeto del contrato original quedarían disponibles para

---

[67] Testimonio del licenciado Alcover García en la vista oral celebrada el 9 de noviembre de 1999.

[68] Exhibits Estipulados Núms. 21-23.

[69] Testimonio del licenciado Alcover García en la vista oral celebrada el 10 de noviembre de 1999.

[70] Informe del Comisionado Especial, pág. 40; Exhibit V del Procurador General, pág. 212.

[71] Exhibits Estipulados Núms. 5 y 28, págs. 22 y 162.

[72] Exhibit Estipulado Núm. 5, págs. 20-25; Exhibit V del Procurador General, págs. 344-345.

la venta a Express Realty 6.8384 cuerdas.[73] El señor Medina Mercado propuso que se redujera proporcionalmente el precio de la finca a doscientos cincuenta y cinco mil ciento sesenta y cinco dólares con quince centavos ($255,165.15), considerando que las dos parcelas tenían una menor cabida (4,722 metros cuadrados), que la originalmente pactada.[74] El precio acordado en la Opción de Compra había sido de trescientos mil dólares ($300,000), pero la descripción de la propiedad contenida en el contrato disponía que la finca tenía una cabida de 8.0399 cuerdas. El precio por metro cuadrado había sido pactado en nueve dólares con cuarenta y nueve centavos ($9.49).[75] En la reducción en precio propuesta por Express Realty, el precio por metro cuadrado permaneció inalterado.[76]

Mediante carta fechada 16 de marzo de 1995, el Subsíndico le informó a Express Realty que la Junta Ratificadora había aceptado su propuesta, a los efectos de ajustar el precio de los terrenos en proporción a su cabida real.[77] **Luego de realizado el reajuste, el precio de adquisición pactado entre la Oficina y Express Realty continuaba sobrepasando proporcionalmente el valor de tasación original.**[78]

En algún momento durante el mes de enero de 1995, y en ocasión de celebrarse un festejo familiar en la residencia del licenciado Alcover García, y estando ambos letrados querellados sentados en la mesa comedor de dicha residencia, la señora Lilliam Ramos Medina, esposa de licenciado Alcover García, le preguntó al licenciado Morell Corrada si su esposo ya le había comentado o explicado de la propuesta que le

---

[73] Íd.

[74] Informe del Comisionado Especial, pág. 20.

[75] Íd.

[76] Íd.

[77] Exhibit V del Procurador General, pág. 371.

[78] Informe del Comisionado Especial, pág. 21.

había hecho a ellos el señor Angelo Medina Mercado.[79] El licenciado Alcover García y el señor Medina Mercado eran amigos de la infancia, pues se habían criado juntos en el pueblo de Aguadilla y mantenían lazos de amistad.[80]

El licenciado Alcover García le explicó al licenciado Morell Corrada, que el señor Medina Mercado tenía opcionada una propiedad y estaba buscando socios capitalistas para desarrollar un centro comercial.[81] Le informó, además, que la referida propiedad pertenecía a la Oficina. Hasta ese momento, el licenciado Morell Corrada no tenía conocimiento alguno de la existencia de esa finca.[82]

En ese momento, el licenciado Morell Corrada le indicó al matrimonio Alcover-Ramos que en pocos días él habría de asistir a una actividad del Partido Nuevo Progresista (P.N.P.) en Aguadilla, e iba a aprovechar el viaje para pasar a examinar la propiedad.[83]

Efectivamente, varios días después, el licenciado Morell Corrada examinó la propiedad y llamó al licenciado Alcover García para pedirle que le comunicara al señor Medina Mercado que estaba interesado en los terrenos.[84] Esta fue su primera gestión con la referida finca ubicada en el Barrio Caimital de Aguadilla.[85]

Por tratarse de una inversión económica sustancial, el licenciado Morell Corrada quiso cerciorarse con anticipación de la viabilidad que tenía la propiedad para ser desarrollada comercialmente.[86] Las gestiones que realizó el señor Morell Corrada consistieron en llamar a amistades que se dedicaban a los negocios de comida rápida para

---

[79] Informe del Comisionado Especial, pág. 26.

[80] Íd., pág. 27.

[81] Testimonio del licenciado Morell Corrada en la vista oral celebrada el 9 de noviembre de 1999.

[82] Informe del Comisionado Especial, pág. 26.

[83] Íd., pág. 27.

[84] Íd.

[85] Informe del Comisionado Especial, pág. 26.

[86] Íd., pág. 28.

enterarse si estaban interesados en ubicar sus negocios en esa zona de Aguadilla.

Realizadas esas gestiones y habiendo confirmado favorablemente la respuesta de dos operaciones de negocios de comida rápida, el 22 de febrero de 1995, mediante escritura pública, se constituyó la Sociedad Especial Costa Mar, en adelante Costa Mar, la cual quedó compuesta en partes iguales por las dos esposas de los aquí querellados y la esposa del señor Medina Mercado.[87]

El licenciado Morell Corrada y su esposa condicionaron su participación como socios capitalistas a la creación de una sociedad nueva. La alternativa de invertir en Express Realty implicaba un riesgo, por ser ésta una corporación de la cual el licenciado Morell Corrada desconocía su origen, trayectoria, gravámenes y vínculos con actividades desconocidas por él.[88]

Según quedó demostrado, la esposa del licenciado Morell Corrada compareció al otorgamiento de la escritura de constitución de sociedad especial, debido a que su esposo no contaba con tiempo suficiente para atender directamente tales asuntos.[89] La esposa del letrado Morell Corrada tenía experiencia en administración y era la persona que habría de encargarse de velar por los intereses de la sociedad legal de

---

[87] El 22 de febrero de 1995, mediante la escritura número dos (2) otorgada ante el notario Edgar R. Vega Pabón, se constituyó Costa Mar S.E. como una Sociedad Especial acogida a los beneficios del suplemento P del Capítulo Tres (3) de la Ley de Contribuciones sobre Ingresos de Puerto Rico, según enmendada (13 L.P.R.A. sec. 3330). En su origen, Costa Mar estaba compuesta, en partes iguales, por la señora Lilliam Ramos Medina (esposa del licenciado Alcover García), la señora Elsa Enid Pérez Grajales (accionista de Express Realty y esposa del señor Medina Mercado) y la señora Carmen J. Casellas Torres (esposa del licenciado Morell Corrada). Véase el Informe Conjunto de Conferencia con Antelación a la Vista, Estipulación de Hecho número 11 y 12, pág. 9, y la declaración jurada de la señora Ramos Medina, Exhibit Estipulado Núm. 30, págs. 164-165.

[88] Testimonio del licenciado Morell Corrada en la vista oral celebrada el 9 de noviembre de 1999.

[89] Informe del Comisionado Especial, pág. 27; Estipulación de Hechos número 11 y Exhibit Estipulado número 30.

gananciales compuesta con su esposo.[90]  Por su parte, y en cuanto a la señora Lilliam Ramos Medina, quedó estipulado por todas las partes en este procedimiento que ésta <u>era una comerciante habitual</u>, casada con el licenciado Alcover García bajo el régimen de separación total económica, a tenor con escritura de capitulaciones matrimoniales otorgada por ambos previo a su matrimonio.[91]

El 23 de febrero de 1995, en una reunión que se había citado en la oficina del Subsíndico,[92] Express Realty depositó la suma de treinta mil dólares ($30,000) para extender la opción de compra, y el señor Medina Mercado le notificó a la Oficina que Costa Mar estaba interesada en adquirir ambas parcelas de terreno, subrogándose en el lugar de Express Realty.[93]  A dicha reunión, el señor Medina Mercado compareció acompañado del licenciado Alcover García, y le expresaron al Subsíndico, señor Paz Guzmán, los pormenores de la constitución de Costa Mar y los propósitos de la misma.[94]

En este mismo encuentro, el señor Medina Mercado solicitó que el licenciado Alcover García fuera el notario público en el otorgamiento de la escritura sobre compraventa de la referida propiedad.  El Subsíndico concluyó que el licenciado Alcover García podía otorgar la escritura sobre compraventa entre la Oficina y Costa Mar, ya que estaba casado bajo capitulaciones matrimoniales, y por no tener, en ese

---

[90] Informe del Comisionado Especial, pág. 27.

[91] El licenciado Alcover García se casó el 17 de junio de 1988 con la señora Lilliam Ramos Medina, bajo capitulaciones matrimoniales. Acordaron que habría total independencia económica para hacer negocios por la cuenta de cada cónyuge, para tomar dinero prestado, vender, ceder, traspasar bienes, sin limitación de clase alguna.  Exhibit Estipulado Núm. 1, págs. 1-6.  Se estipuló que la señora Ramos Medina es comerciante.  Estipulación de hechos número 12, pág. 9.

[92] El Subsíndico Arturo Paz Guzmán, en el desempeño de sus funciones, tenía poderes similares al Síndico de la C.R.U.V., los cuales le fueron delegados mediante escritura pública.  Exhibit Estipulado Núm. 3, pág. 12.

[93] Informe del Comisionado Especial, pág. 36.

[94] Íd., pág. 37; Exhibit Estipulado Núm. 3, págs. 12-13.

momento, un interés económico en Costa Mar. Concluyó, además, que no existía impedimento legal para la cesión de la referida opción de compra de las dos (2) parcelas a Costa Mar, razón por la cual autorizó dicha cesión.[95] Sin embargo, el 27 de marzo de 1995, el nuevo Síndico, licenciado Antonio Cabrero Muñiz, desautorizó la referida cesión a Costa Mar. Fundamentó su decisión en que Express Realty <u>ya había adelantado dinero para efectuar la compraventa</u>.[96]

**Posteriormente, el señor Medina Mercado, por razón de sus relaciones comerciales con el Municipio de Aguadilla, advino a conocimiento de que la Corporación del Fondo del Seguro del Estado, en adelante Fondo del Seguro del Estado, tenía planes de obtener la posesión de un nuevo edificio para sus oficinas regionales de Aguadilla.[97] Por lo cual, el 8 de marzo de 1995, la señora Ramos Medina, Administradora de Costa Mar y esposa del licenciado Alcover García, le escribió una carta al señor Oscar Ramos Meléndez, Administrador del Fondo del Seguro del Estado, mediante la cual presentó una propuesta para la construcción y arrendamiento de un edificio donde se proponía se albergaran las facilidades de la Oficina Regional del Fondo del Seguro del Estado en el Municipio de Aguadilla.[98] Señaló que el edificio se localizaría en la parcela B-2 y acompañó un plano del lugar propuesto para su construcción.[99]**

Sobre este particular, se le imputó en la querella al licenciado Morell Corrada que advino en conocimiento de que las propiedades

---

[95] Exhibit Estipulado Núm. 3, págs. 12-13; Exhibit V del Procurador General, págs. 382-384.

[96] Informe del Comisionado Especial, pág. 23; Exhibit V del Procurador General, pág. 345.

[97] Testimonio del licenciado Morell Corrada en la vista oral celebrada el 9 de noviembre de 1999.

[98] Exhibit Estipulado Núm. 33, págs. 174-175.

**[99] Íd.**

ubicadas en el Municipio de Aguadilla estaban a la venta a través de su participación en el Comité de Transición de Gobierno de 1993.[100] No obstante, el Procurador General <u>no desfiló prueba alguna que sustentara dicha alegación</u>. Por el contrario, la prueba desfilada estableció que el licenciado Morell Corrada no tuvo conocimiento ni vio el inventario de fincas que preparó la Oficina del Síndico de la C.R.U.V., mientras se desempeñó como Presidente del Comité de Transición, en ocasión del cambio de administración de gobierno en el año 1993.[101] No tuvo contacto con documento o información alguna en dicho proceso, relacionada con el terreno en cuestión.[102] No se desfiló prueba por ninguna de las partes sobre la fecha exacta en que el Fondo del Seguro del Estado comenzó a desarrollar sus planes para reubicar las Oficinas Regionales de Aguadilla en el Barrio Caimital.[103] **De la prueba que obra**

---

[100] En 1992 el Partido Nuevo Progresista ganó las elecciones generales en Puerto Rico. Se nombró un Comité de Transición para que facilitara y garantizara que la obra pública no se viese afectada. El licenciado Morell Corrada representó y presidió dicho Comité. El Comité evaluó las operaciones de todas las agencias del Gobierno, especialmente la situación presupuestaria de las mismas. La Oficina del Síndico rindió un Informe al Departamento de la Vivienda, pero ninguno de los funcionarios de dicha oficina depuso ante el Comité de Transición. El informe de la Oficina no fue sometido al Comité de Transición, porque el nombramiento del incumbente era por un término fijo y sus funciones no terminaban con el cambio de administración, razón por la cual no fue objeto de evaluación por parte de dicho Comité. El licenciado Morell Corrada declaró que no leyó ni tuvo conocimiento del contenido del informe preparado por la Oficina que fue sometido al Departamento de la Vivienda. Sostuvo, que el informe de la Corporación del Fondo del Seguro del Estado no contenía ninguna recomendación, a los efectos de que se construyeran nuevas instalaciones para sus oficinas regionales en el Municipio de Aguadilla. La recomendación suscrita por la Corporación del Fondo del Seguro del Estado fue a los efectos de que se adquirieran las facilidades existentes en varios municipios incluyendo a Aguadilla. En la forma en que se condujeron los trabajos del Comité de Transición, el licenciado Morell Corrada no leyó el informe de dicha corporación. El informe del Síndico contenía un Anejo C que inventariaba todas las fincas a ser liquidadas por la Oficina, entre las cuales se encontraban varias fincas en el Municipio de Aguadilla. Sin embargo, no especificaba el sector donde estaban localizadas. Informe del Comisionado Especial, págs. 11-14.

[101] Informe del Comisionado Especial, pág. 13.

[102] Íd.

[103] Íd.

**en el expediente se desprende que dichos planes comenzaron en algún momento durante el 1995.**[104]

Como parte de sus funciones notariales, el licenciado Alcover García otorgó el 7 de abril de 1995 la escritura número ocho (8) de rectificación de cabida, en la que compareció de una sola parte la Oficina, representada por el Subsíndico, señor Arturo Paz Guzmán.[105] Ese mismo día, el licenciado Alcover García otorgó la escritura número nueve (9) de segregación compareciendo en la misma el Subsíndico.[106] Por virtud de la misma se segregaron las ya mencionadas cinco parcelas de terreno que componían la finca original opcionada, parte de la cual comprendía el terreno vendido a Express Realty. Dichas segregaciones fueron autorizadas por la Junta de Planificación, mediante resolución notificada a las partes el 24 de enero de 1995.[107]

El 21 de abril de 1995 se otorgó la escritura pública número diez (10) ante el notario Alcover García, mediante la cual Express Realty adquirió, a título de compraventa, las dos parcelas (B-2 y B-2-A) por la suma de doscientos cincuenta y cinco mil ciento sesenta y cinco dólares con sesenta y dos centavos ($255,165.62).[108] Los comparecientes en la referida escritura no tenían vínculo alguno, directo o indirecto, con el licenciado Alcover García al momento de su otorgamiento.[109] Las escrituras anteriormente señaladas fueron debidamente inscritas en el Registro de la Propiedad de Puerto Rico, Sección de Aguadilla.[110]

---

[104] Informe del Comisionado Especial, pág. 26.

[105] Escritura de rectificación de cabida otorgada el 7 de abril de 1995 ante el notario Alcover García, aquí querellado, inscrita en el folio 224 del tomo 277, finca número 11,610. A dicha escritura sólo compareció la Oficina. Exhibit Estipulado Núm. 4, págs. 14-19.

[106] Exhibit Estipulado Núm. 5, págs. 20-24.

[107] Consulta número 94-01-1303 JGT. Informe del Comisionado Especial, pág. 31.

[108] Exhibit Estipulado Núm. 6, págs. 26-30.

[109] Informe del Comisionado Especial, pág. 39.

[110] Íd.

Tres días más tarde, Costa Mar adquirió de Express Realty las referidas parcelas por el mismo precio que ésta había pagado a la Oficina.[111] Una vez Costa Mar advino dueña de las parcelas, la señora Ramos Medina, esposa del licenciado Alcover García, continuó gestionando el desarrollo de éstas para la ubicación de las Oficinas Regionales del Fondo del Seguro del Estado.[112]

Para julio de 1995, era evidente el éxito de estas gestiones, ya que el Fondo del Seguro del Estado manifestó su interés de instalar su Oficina Regional de Aguadilla en dichos terrenos. La construcción de un edificio comercial para ser arrendado por el Fondo del Seguro del Estado, produjo que el licenciado Morell Corrada sintiera que lo colocaba en una situación difícil, ya que éste era el Secretario General del Partido de Gobierno.[113] Ante estas circunstancias, el licenciado Morell Corrada decidió desvincularse de Costa Mar, para evitar interpretaciones e insinuaciones, a los efectos de que había utilizado su posición para lucrarse.[114]

El 14 de julio de 1995, la señora Casellas Torres, esposa del licenciado Morell Corrada, ofreció en venta su participación a la señora Ramos Medina.[115] El 11 de octubre de 1995, la sociedad legal de gananciales Morell-Casellas vendió su participación en Costa Mar al licenciado José B. Alcover García por la suma de ochenta y cinco mil dólares ($85,000), pagaderos en el plazo de dos (2) años. Ello equivalía a la aportación original realizada por la sociedad legal de gananciales Morell-Casellas a Costa Mar al momento de su

---

[111] Escritura de compraventa otorgada ante el notario Edgar R. Vega Pabón el 24 de abril de 1995, Exhibit Estipulado Núm. 2, págs. 7-11.

[112] Informe del Comisionado Especial, págs. 28 y 38.

[113] Íd., pág. 28.

[114] Íd.

[115] La escritura de constitución de Costa Mar le confirió a los socios el derecho de tanteo sobre la venta de sus participaciones a los demás socios. Informe del Comisionado Especial, pág. 28.

constitución.[116]  **En la referida transacción, la sociedad de ganaciales Morell-Casellas no devengó beneficio económico alguno de Costa Mar, ya que vendieron su participación por la misma cantidad que habían aportado al momento de constituirse dicha sociedad especial.[117]**

Luego de esta transacción, el licenciado Morell Corrada terminó todo vínculo con Costa Mar y con el desarrollo de las parcelas para el establecimiento de las oficinas regionales del Fondo del Seguro del Estado.[118]  El Bufete III se disolvió el 31 de enero de 1996.  Ese mismo día, el licenciado Morell Corrada le envió una carta al licenciado Cabrero, Síndico Especial, informándole sobre la disolución de la referida sociedad profesional.  Le solicitó que se dejara sin efecto el contrato número 94-SE-0003-B.[119]

El 1ro. de febrero de 1996 el Síndico Especial y el licenciado José B. Alcover García firmaron un contrato de servicios profesionales, en iguales términos que los anteriores, con vigencia hasta el 30 de junio de 1996.[120]

En cumplimiento con la Resolución que emitiéramos el 24 de noviembre de 1997, el Procurador General de Puerto Rico formuló querella contra los licenciados Marcos Morell Corrada y José Alcover García.

El Procurador General presentó en contra de los licenciados Morell Corrada y Alcover García los cargos siguientes:

CARGO I

Los licenciados Marcos Morell Corrada y José Alcover García incurrieron en conducta violatoria al Cánon [sic] 6 de Etica Profesional (4 L.P.R.A. Ap. IX C. 6) al ocultarle al Síndico Liquidador de Cuentas de la C.R.U.V. la existencia de

---

[116] Exhibit Estipulado Núm. 35.

[117] Informe del Comisionado Especial, pág. 29.

[118] Íd.

[119] Carta de 31 de enero de 1996, Exhibit Estipulado Núm. 25, pág. 135. Ese mismo día el licenciado Alcover García y el Síndico Especial, firmaron la Resolución del Contrato de Servicios Profesionales, número 94-SE-0003-B, Exhibit Estipulado Núm. 26, pág. 136.

[120] Contrato número 96-SE-0006, Exhibit Estipulado Núm. 24, pág. 134.

contratos con otras agencias del gobierno cuando ello estaba prohibido por el Artículo 12 de la Ley Núm. 55 de 9 de agosto de 1991 (17 L.P.R.A. sec. 27K). También ocultaron su relación e intereses con el Sr. Angelo Medina y COSTA MAR S.E. para, de forma indirecta, adquirir un predio de terreno localizado en el Bo. Caimital de Aguadilla y perteneciente a la C.R.U.V. en beneficio propio, de sus esposas, la sociedad especial formada por éstas y la esposa del Sr. Angelo Medina. Los abogados no pusieron a la Oficina del Síndico en posición de decidir imparcialmente al no llevar a su atención todos los hechos y elementos necesarios para que ésta pudiera llevar a cabo su función y adjudicar adecuadamente.

## CARGO II

Los licenciados Morell Corrada y Alcover García violaron el Cánon [sic] 19 de Ética Profesional (4 L.P.R.A. Ap. IX C. 19) al no mantener a su cliente, el Síndico, informado de todas las relaciones con sus clientes (otras agencias del gobierno), con terceras personas (Angelo Medina, Costa Mar y sus respectivas esposas) y de su interés en adquirir el terreno de Aguadilla. No le informaron el estudio de título que sobre el predio de Aguadilla solicitaron, de sus gestiones para desarrollarlo como un centro comercial con negocios de comida rápida y un garaje de gasolina o con las oficinas del Fondo del Seguro del Estado y Celulares Telefónica.

Esta falta de información al cliente también es contraria al primer párrafo de la claúsula [sic] "Decimo [sic] Novena" del contrato de servicios profesionales.

## CARGO III

Los licenciados Alcover García y Morell Corrada infringieron el deber impuesto por el Cánon [sic] 21 de Etica Profesional (4 L.P.R.A. Ap. IX C. 21) al no divulgar sus relaciones con terceras partes (Angelo Medina, Express Realty y COSTA MAR) y su interés en adquirir el terreno de Aguadilla. Máxime cuando dicho interés podía afectar su juicio profesional. Lo anterior violentó el deber de lealtad completa que para su cliente requiere dicho Cánon [sic] 21 y la cláusula Décimo Novena del contrato de servicios profesionales.

No recomendaron al Síndico que buscara asesoramiento legal con otros abogados, ya que ellos y sus esposas, a través de COSTA MAR S.E., estaban interesados en una propiedad de la C.R.U.V.

Al amparo de las cláusulas PRIMERA Y DECIMONOVENA del contrato de servicios profesionales el Bufete Morell Alcover incurrió en un conflicto potencial de intereses, ya que estas disposiciones imponían a los letrados el deber de representar a la Oficina del Síndico en aquellos casos o asuntos en el que el Síndico fuera demandado o demandante en cumplimiento de la Ley Núm. 55, supra. Ello incluía las resoluciones de contratos (Opción de compra y compraventa, por ejemplo) y las ejecuciones de hipotecas. La venta y posterior compra del terreno por las esposas de los abogados, y más tarde por uno de los propios abogados (Alcover) representó un potencial

conflicto de intereses de haber surgido o de surgir cualquier conflicto sobre la legalidad de dicho negocio jurídico.

CARGO IV

El licenciado José Alcover García violó el Cánon [sic] 34 de Etica Profesional (4 L.P.R.A. Ap. IX C. 34) al conseguir que el Sr. Angelo Medina, a quien conocía desde su adolescencia y quien se le acercó para realizar el negocio del terreno, solicitara y obtuviera del Síndico la aprobación para que Alcover García actuara como notario en las escrituras relacionadas al predio de Aguadilla. Antes de que otorgara las escrituras, el licenciado Alcover García había solicitado un estudio de título del terreno y hecho gestiones para su desarrollo. Posteriormente, adquirió una tercera parte del negocio.

Más aún, otorgó unas escrituras para la venta de un solar sobre el cual en [sic] él tenía un interés pecuniario.

CARGO V

Los licenciados Alcover García y Morell Corrada violaron el Cánon [sic] 38 de Etica Profesional (4 L.P.R.A. Ap. IX C. 38) al realizar gestiones para el desarrollo de un terreno perteneciente a su cliente (la Oficina del Síndico); al crear un "alter ego" mediante una sociedad especial administrada por sus esposas (COSTA MAR S.E.) para adquirir un terreno perteneciente a su cliente; al preparar las escrituras de compraventa del terreno y tres días después adquirirlo al mismo precio y al no asesorar adecuadamente al Síndico liquidador para que buscara consejo legal con otros abogados ante el conflicto que representaba el interés de los abogados querellados en adquirir una propiedad de su cliente.

Mediante Resolución de 2 de abril de 1998, nombramos al honorable Wilfredo Alicea López, Comisionado Especial, para que escuchara y recibiera la prueba que las partes tuvieran a bien presentar. Evaluado el Informe del Comisionado Especial, el expediente de este Tribunal, la grabación de la prueba desfilada en las vistas evidenciarias, así como las posiciones de los querellados, nos encontramos en posición de resolver las controversias que presenta el procedimiento disciplinario ante nos.

II

En síntesis, todos los cargos imputados por el Procurador General descansan en las siguientes alegaciones: ocultar al Síndico la existencia de contratos con otras agencias o instrumentalidades

públicas en violación a lo dispuesto por ley; ocultar su relación e intereses con el señor Medina Mercado, Express Realty y Costa Mar y el interés que tenían de adquirir el terreno localizado en el Barrio Caimital de Aguadilla; ocultar de manera similar las gestiones que se hicieron desde un principio para desarrollar dicha parcela de terreno, entre ellas la solicitud de un estudio de título; y otorgar las escrituras sobre un predio en el cual ya tenían un interés pecuniario. Entiende el Procurador General que las anteriores actuaciones configuran conducta violatoria de los Cánones 6, 19, 21, 34 y 38 de Ética Profesional;[121] del Artículo 12 de la Ley Núm. 55, supra; y de las cláusulas PRIMERA y DECIMONOVENA de los contratos de servicios profesionales entre los Bufetes II y III y la Oficina.

Discutiremos, en primera instancia, las alegaciones que pretenden sostener todos los cargos y luego las alegadas violaciones a cada uno de los cánones, según fueran desglosadas en cada uno.

En los primeros dos cargos se les imputa a los licenciados Morell Corrada y Alcover García conducta violatoria del Artículo 12 de la Ley Núm. 55, supra, alegando que los querellados ocultaron al Síndico la existencia de contratos con otras agencias, cuando ello estaba prohibido por ley.

El Artículo 12 de la Ley Núm. 55, supra, prohibía expresamente al Síndico que contratara los servicios profesionales de aquellos abogados o bufetes que, a su vez, mantuvieran contratos con otras agencias o instrumentalidades públicas. Dicho artículo lee, en lo pertinente, como sigue:

> Artículo 12.- El Síndico Especial contratará los servicios legales necesarios para la tramitación de los asuntos legales relacionados con el desempeño de sus funciones, pudiendo, además, el Departamento de Justicia brindar el apoyo legal que sea necesario. **No podrán contratarse a abogados o bufetes que estén bajo contrato con otras agencias o instrumentalidades públicas.[122]**
>
> ...

---

[121] 4 L.P.R.A. Ap. IX, C. 6, C. 19, C. 21, C. 34 y C. 38.
[122] Ley Núm. 55, supra, Art. 12, págs. 238-239.

En el presente caso, los letrados, aquí querellados, mantuvieron acuerdos o contratos con otras entidades gubernamentales. Dichas entidades gubernamentales fueron el Banco Gubernamental de Fomento y el Banco de la Vivienda. El acuerdo denominado "contrato de servicios profesionales" entre el Bufete II y el Banco Gubernamental de Fomento no configuró un contrato de servicios profesionales entre las partes, por la naturaleza y propósito del mismo. El referido acuerdo se limitaba a permitir que el Bufete II le pudiera rendir servicios a sus clientes cuando realizaran transacciones con el mencionado Banco. De otro lado, quedó claro que los contratos con el Banco de la Vivienda se suscribieron con el único propósito de brindarle precisamente los mismos servicios a prestarse a la Oficina, por virtud de los contratos otorgados directamente con esta última.

Resulta importante destacar que el Procurador General no presentó prueba que demostrara, de manera clara, robusta y convincente, ninguno de los cargos que le imputó a los aquí querellados. Tampoco demostró, mediante prueba lo alegado por el quejoso, licenciado Aníbal Acevedo Vilá, en sus escritos y comparecencias ante este Tribunal. La única prueba que ofreció el Procurador General fue a los efectos de la existencia de esos acuerdos y contratos. Al desglosar el contenido de los mismos, nos resulta forzoso concluir que en ambas situaciones no se violó la aludida prohibición del Artículo 12 de la Ley Núm. 55, supra. No existe conflicto entre la fecha de vigencia de los contratos de servicios profesionales para prestar servicios a la Oficina, con otros acuerdos o contratos celebrados para prestar servicios a otras agencias o instrumentalidades públicas.

La mencionada prohibición estatutaria se extiende a abogados que mantengan contratos con otras agencias o instrumentalidades públicas. El Banco de la Vivienda y el Banco Gubernamental de Fomento son corporaciones públicas.[123] El Artículo 21(a) de la Ley Núm. 55, supra, definía agencia o instrumentalidad pública como "cualquier

departamento, oficina, negociado, comisión, institución, administración, corporación pública o subsidiaria de ésta o municipio del Estado Libre Asociado de Puerto Rico".

Tampoco se desfiló prueba por la Oficina del Procurador General que pueda llevarnos a concluir que los querellados ocultaron la existencia de sus otros acuerdos o contratos a la Oficina.[124]

¿Violaron los querellados el Artículo 18 del Reglamento Enmendado de la Oficina, en el que se les prohibía a asesores del Síndico o a familiares o agentes de éstos, adquirir propiedad alguna que estuviese bajo el control de la Oficina?[125]

El Artículo 13 de la Ley Núm. 55, supra, confirió poder a la Oficina para adoptar los reglamentos necesarios para la administración de los asuntos relacionados con el ejercicio de sus funciones y deberes. Con la finalidad de acelerar el proceso de liquidación de la C.R.U.V., se eximió a la Oficina del cumplimiento con las disposiciones de la Ley de Procedimiento Administrativo Uniforme, 3 L.P.R.A. sec. 2101 et seq.[126]

---

[123] Véase, 3 L.P.R.A. sec. 441e y 7 L.P.R.A. sec. 551, respectivamente.

[124] Del Informe del Comisionado Especial no se refleja adjudicación alguna en cuanto a este particular.

[125] El Procurador General formuló alegación, a los efectos de que los querellados violaron el Reglamento Enmendado de la Oficina luego de que este Tribunal hubiese instruido la presentación de cargos en este procedimiento disciplinario, alegación que no estaba contenida en el informe del Procurador General que generó nuestra orden para que se presentara la querella. Aún así, esta alegación fue discutida y argumentada en la vista en su fondo, frente a la objeción de parte de ambos querellados, a los efectos de que dicha alegación era tardía y, en consecuencia, el Comisionado Especial carecía de jurisdicción para atenderla.

[126] Sobre este particular, el Artículo 13 de la referida ley, dispone lo siguiente:

Artículo 13.- La Oficina adoptará los reglamentos que sean necesarios para la administración de sus asuntos y prescribirá reglas, reglamentos y normas en relación con el ejercicio de sus funciones y deberes. Con el fin de acelerar el proceso de liquidación, se exime a la Oficina del Síndico del cumplimiento de los requisitos de la Ley Núm. 170 de 12 de agosto de 1988, conocida como la "Ley de Procedimiento Administrativo Uniforme".

En virtud de lo anterior, el 31 de agosto de 1992, el entonces Síndico, licenciado José L. Cotto Ramos, aprobó el Reglamento para la Disposición de la Propiedad Inmueble de la Oficina para la Liquidación de las Cuentas de la C.R.U.V. El Artículo 18 de dicho Reglamento específicamente disponía que no podría adquirir propiedad, bajo el control de la Oficina, aquel que fuera funcionario, empleado o asesor del Síndico, de la Junta Ratificadora o del Comité de Transición o que fuera familia o agente de éstos.[127] No obstante, el Artículo 30 del referido reglamento estableció que entraría en vigor inmediatamente luego de su aprobación, una vez que éste fuera **radicado en el Departamento de Estado para su conocimiento público y fiel implantación**.[128] Dicho reglamento **nunca fue radicado** en el Departamento de Estado.[129]

Las reglas o reglamentos son expresiones de aplicación general que interpretan, implantan o prescriben la ley o la política pública.[130] Toda reglamentación tiene la misma fuerza vinculante que la ley, habida cuenta que determina derechos, deberes u obligaciones de las personas o individuos sujetos a la jurisdicción de la agencia.[131] Una vez se ha promulgado un reglamento, existe la obligación de cumplir con sus disposiciones.[132] La agencia reguladora debe velar que los requisitos estatutarios establecidos en su reglamento sean cumplidos, sirviendo

---

[127] Exhibit I, Anejo C-2 del Procurador General: "Informe de Transición de la Oficina para la Liquidación de las Cuentas de la Corporación de Renovación Urbana y Vivienda" preparado por el licenciado José L. Cotto Ramos para el señor Roberto Figueroa fechado el 23 de noviembre de 1992.

[128] Exhibit I, Anejo C-2, pág. 67.

[129] Informe del Comisionado Especial, págs. 11 y 35.

[130] Demetrio Fernández Quiñones, Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme, 1ra ed., Colombia, Ed. Forum, 1993, pág. 53.

[131] Fernández Quiñones, op. cit.

[132] Com. Vec. Pro-Mej., Inc. v. J.P., 147 D.P.R. 750 (1999); García Cabán v. U.P.R., 120 D.P.R. 167, 175 (1987); Díaz de Llovet v. Gobernador, 112 D.P.R. 747, 757 (1982); García v. Adm. del Derecho al Trabajo, 108 D.P.R. 53 (1978).

siempre los propósitos, objetivos y política pública que los forjaron.[133] Asimismo, hemos reiterado que las agencias están compelidas a observar estrictamente sus propios reglamentos una vez promulgados.[134]

En el presente caso, el mero hecho de que la Oficina esté exenta de cumplir con la Ley de Procedimiento Administrativo Uniforme, supra, no constituye eximente para que incumpliera con sus propias disposiciones reglamentarias, concernientes a la forma y manera que habría de implantarse e imprimirle conocimiento público a su reglamento. El referido reglamento establecía que para su implantación y público conocimiento, el mismo debía radicarse en el Departamento de Estado, **como requisito sine qua non para su vigencia**. Al no hacerlo, la Oficina incumplió con sus propias disposiciones reglamentarias. De ahí, concluimos que la omisión de radicar el referido Reglamento en el Departamento de Estado hace el mismo inaplicable a los hechos de este caso, por no estar vigente a la fecha de la ocurrencia de los mismos.

La segunda alegación del Procurador General, repetida en todos los cargos, imputa a los querellados ocultar información sobre su relación e intereses con el señor Medina Mercado y Costa Mar, con el fin de poder adquirir la finca perteneciente a la C.R.U.V., de manera indirecta. **No obstante, la prueba estipulada, así como la desfilada por el propio Procurador General, establece todo lo contrario.**

La prueba estipulada por todas las partes demostró que la Oficina **tuvo pleno conocimiento de todos los hechos y elementos necesarios para que ésta pudiera llevar a cabo su función y adjudicar adecuadamente**.[135] Durante la reunión celebrada en febrero de 1995, el señor Medina Mercado y el licenciado Alcover García le informaron al Subsíndico de la

---

[133] Asoc. Vec. H. San Jorge v. U. Med. Corp., res. el 19 de enero de 2000, 2000 TSPR 7, 150 D.P.R. ___ (2000), 2000 J.T.S. 21; Montoto v. Lorié, 145 D.P.R. 30 (1998).

[134] T. Jac, Inc. v. Caguas Centrum Limited, res. el 12 de abril de 1999, 99 TSPR 54, 148 D.P.R. _____ (1999),99 J.T.S. 60; Montoto v. Lorié, supra; García Cabán v. U.P.R., supra.

existencia de Costa Mar, y la identidad de sus socias, <u>antes</u> de que éste autorizara la sustitución de Express Realty por Costa Mar. El Subsíndico evaluó y analizó la situación y concluyó que la transacción era válida. A la luz de estos hechos, no se sostiene la alegación de que los querellados intentaran utilizar a Costa Mar como un "alter ego" para ocultar su interés de adquirir una propiedad perteneciente a la Oficina. El estudio de título solicitado por el licenciado Alcover García fue hecho para cumplir con sus funciones notariales, fue pagado por la Oficina y obra en su expediente.

En virtud de lo anterior, concluimos que la Oficina tuvo ante sí toda la información relativa al interés del señor Medina Mercado y/o Express Realty en adquirir la finca del Barrio Caimital,[136] así como los datos concernientes a la constitución de Costa Mar, sus socios, el interés de ésta en sustituir a Express Realty en el contrato de opción a compra y la existencia del referido estudio de título.

Se le imputó, además, a ambos querellados la violación de los contratos de servicios profesionales que suscribieran la Oficina y los Bufetes II y III, los cuales eran idénticos. Específicamente, se señalaron violaciones a la PRIMERA y la DECIMONOVENA CLÁUSULA del contrato de servicios profesionales. La primera cláusula delimita cuáles serían los servicios que le brindarían las referidas firmas a la Oficina. La decimonovena cláusula establecía la obligación de parte de estas firmas de abogados, de divulgar todas las circunstancias de sus relaciones con clientes y con terceras personas; el deber de lealtad y la consabida prohibición de tener intereses adversos a los de dicho organismo gubernamental.

En cuanto a la PRIMERA CLÁUSULA, específicamente se disponía que las referidas firmas de abogados representarían a la Oficina en las siguientes instancias: (1) en todos aquellos casos o asuntos que por razón del cumplimiento de las funciones y responsabilidades que le asigna

---

[135] Exhibit Estipulado Núm. 3.

la ley, sean demandados o traídos ante los Tribunales o en las agencias administrativas, la Oficina o sus empleados; (2) cuando sea necesario comparecer para defender los derechos, obligaciones y prerrogativas que le asigna la ley y/o que el Síndico les refiera; (3) en todo proceso de ejecución de hipoteca y/o resolución de contrato que se refiera y/o haya sido instado ante los Tribunales o Agencias del Estado Libre Asociado o de Estados Unidos; (4) el cobro extrajudicial y judicial (entiéndase cobros y ejecuciones de hipoteca) de todos aquellos préstamos hipotecarios que la Oficina le refiera.[137]

El Procurador General alegó que la venta y compra posterior de los terrenos en cuestión representaba una fuente de potencial conflicto de interés entre los querellados y la Oficina. Para sostener esta alegación **el Procurador General se apoyó únicamente en el contenido de los contratos en cuestión**. Arguyó que los letrados tenían la obligación de representar al Síndico en toda **resolución de contrato, y** en aquellos casos donde éste fuera demandado o demandante.[138]

El término "resolución de contrato", en el contrato de marras, **tiene un significado distinto al usual**, ya que no implica la representación del Síndico en casos en que una parte resuelve o incumple con una opción de compra y/o contrato con el Síndico.

El Artículo 1 de la Ley Núm. 118 de 12 de junio de 1980,[139] define el término "resolución de contrato" de la siguiente manera:

> Se faculta al Departamento de la Vivienda y sus agencias o corporaciones adscritas o a la Oficina para la Liquidación de las Cuentas de la Corporación de Renovación Urbana y Vivienda de Puerto Rico a llevar ante el Tribunal Superior un **procedimiento especial uniforme de resolución de contrato de compraventa y transferencia de título de propiedad o de la transferencia de título solamente,** según corresponda, de las viviendas construidas, vendidas o financiadas bajo cualquier programa de vivienda del Departamento, sus agencias o corporaciones adscritas o cuyo titular sea la Oficina para la Liquidación de las Cuentas de la Corporación de Renovación Urbana y Vivienda **en aquellos casos en que la vivienda se encuentre desocupada y en estado de abandono y que el deudor**

---

[136] Íd.
[137] Informe del Procurador General, pág. 3.
[138] Íd., pág. 21.

[139] 17 L.P.R.A. sec. 94(a).

**hipotecario haya incumplido el pago de dos (2) o más mensualidades consecutivas del préstamo hipotecario concedido a su favor.** (Énfasis nuestro.)

...

Dicho de otro modo, el procedimiento especial denominado **"resolución de contrato"** se refiere a un procedimiento equivalente a la ejecución de una hipoteca sobre una vivienda desocupada y en estado de abandono, cuando se incumple con los términos y condiciones del préstamo hipotecario.[140] Los querellados se obligaron contractualmente a representar al Síndico y a la Oficina en todo proceso de "ejecución de hipoteca y/o resolución de contrato" ante los tribunales de Puerto Rico y de Estados Unidos.

Una lectura del contrato de servicios profesionales pactado entre los Bufetes II y III y la Oficina, los cuales fueron estipulados por las partes y utilizados por el Procurador General para apoyar su posición, refleja que **nunca se acordó el asesoramiento legal de los referidos bufetes, en cuanto a las negociaciones de compraventa de los bienes inmuebles bajo el control de la Oficina**. No figuraba entre las responsabilidades contractuales de los querellados ofrecer dicho asesoramiento. Del expediente ante esta Curia y de las determinaciones de hechos y conclusiones de derecho del Comisionado Especial basadas en la prueba desfilada, tampoco surge que los querellados **hayan asesorado** a la Oficina en relación con los términos de la compraventa entre ésta y Express Realty.

Ante la ausencia de presentación de prueba por el Procurador General, concluimos que ninguno de los querellados actuó en forma contraria a lo dispuesto por las cláusulas de los contratos de servicios profesionales otorgados por ellos con la Oficina, porque nunca contrajeron la responsabilidad de asesorar al Síndico en cuanto a la venta de bienes inmuebles bajo el control de la Oficina y, como cuestión de hecho, tampoco lo hicieron voluntariamente.

III

De todos los cargos se desprenden imputaciones de violación a los Cánones 6, 19, 21, 34 y 38 de Ética Profesional, _supra_. En el primer cargo (Cargo I) se imputa la violación al Canon 6 del Código de Ética Profesional, _supra_, que regula la conducta que debe observar la clase togada ante las agencias gubernamentales y la conducta de un abogado que, además, sea un funcionario público. Dicha norma ética lee como sigue:

> Al prestar sus servicios profesionales ante organismos legislativos o administrativos el abogado debe observar los mismos principios de ética profesional que exige su comportamiento ante los tribunales. Es impropio de un abogado ocultar su gestión profesional ante dichas agencias gubernamentales mediante el empleo de terceros o de medios indirectos para promover determinada acción gubernamental en interés de su cliente. Un abogado que ejerza su profesión y que además ocupe un cargo legislativo o gubernamental debe anteponer el interés público al de su cliente cuando ambos vengan en conflicto e inmediatamente renunciar la representación del cliente.

**Para que sea de aplicación el precitado canon, se requiere que concurran una de las siguientes circunstancias: un abogado <u>que postulando ante una agencia administrativa</u> oculta su gestión profesional, mediante el empleo de un tercero o medios indirectos para promover un determinado curso de acción gubernamental en beneficio de su cliente; o un abogado que representa a un cliente privado ante esa agencia, mientras <u>ocupa un cargo legislativo o gubernamental</u>, y se produce un conflicto.** Ninguna de las instancias que contempla esta norma ética están presentes en los hechos de autos. Veamos.

**Alegó el Procurador General para apoyar este primer cargo, que los querellados ocultaron a la Oficina sus contratos con otras agencias y su interés de adquirir de forma indirecta el terreno localizado en el Barrio Caimital de Aguadilla. La prueba, como dijéramos, reveló todo lo contrario.[141] La Oficina del Síndico era una de liquidación de propiedades, mediante su venta, y no un foro administrativo con facultades cuasi-judiciales <u>ante el cual postularan abogados</u>.**

---

[140] Íd.

La segunda oración del Canon 6, supra, establece que es impropio que un abogado, que representa a un cliente ante una agencia, utilice terceros u otros medios para promover una actuación gubernamental en beneficio de ese cliente. No obstante, la relación de hechos consignada en los cargos no le imputa a los querellados el haber utilizado a terceras personas u otros medios para promover una acción específica en beneficio de algún cliente, mientras representaban un cliente ante un foro administrativo. El único cliente que figura en el presente procedimiento disciplinario es la propia Oficina.

Por último, la tercera oración del Canon 6, supra, tampoco guarda relación con los hechos del caso. Ésta impone sobre un letrado que ocupa un cargo legislativo o gubernamental la obligación de anteponer los intereses públicos a los de su cliente, cuando ambos advienen en conflicto. Ninguno de los aquí querellados ocupaba un cargo legislativo o gubernamental cuando ocurrieron los hechos.

Resulta forzoso concluir que este Canon es inaplicable al presente procedimiento disciplinario, en ausencia de alegaciones específicas que pudieran estar comprendidas bajo las modalidades de conducta tipificadas como antiéticas en el mismo.

De igual forma, consideramos improcedente el segundo cargo (Cargo II), donde se imputa la violación al Canon 19 de Ética Profesional, supra,[142] el cual impone al abogado el deber de mantener informado a su cliente de todos los asuntos que surjan **en el desarrollo del caso que le ha sido encomendado**.[143]

---

[141] Exhibit Estipulado Núm. 3.

[142] Sobre este particular, esta norma ética lee, en lo aquí pertinente, como sigue:

> El abogado debe mantener a su cliente siempre informado de todo asunto importante que surja en el desarrollo del caso que le ha sido encomendado.

[143] In re Torres Delgado, res. el 26 de abril de 2000, 2000 TSPR 65, 150 D.P.R. ___ (2000), 2000 J.T.S. 77; In re Arroyo Rivera, res. el 19 de mayo de 1999, 99 TSPR 78, 148 D.P.R. ___ (1999), 99 J.T.S. 88; In re Palou Bosch, res. el 30 de junio de 1999, 99 TSPR 132, 149 D.P.R. ____ (1999), 99 J.T.S. 137; In re Cardona Vázquez, 108 D.P.R. 6 (1978).

Se le imputa a los querellados la violación del referido Canon, al señalar que los querellados no informaron a la Oficina del Síndico de sus relaciones con el señor Medina Mercado y el interés de adquirir las parcelas del Barrio Caimital de Aguadilla. Sin embargo, del texto de este Canon se desprende que la norma ética propuesta sólo aplica a la situación en que un abogado no mantiene a su cliente debidamente informado del asunto que se le encomendó.[144] Es decir, considerados todos los hechos, según la prueba estipulada por el Procurador General, resulta claro que la querella no aludió a controversia alguna en torno a casos que se le hubiesen encomendado a los querellados. Por lo tanto, encontramos que es también improcedente la aplicación de este Canon a la querella de autos.

No obstante, aunque los querellados no tenían una obligación de divulgación, por no ser la aludida transacción un "caso encomendado", quedó demostrado por la prueba desfilada que la Oficina estuvo en todo momento informada de los pormenores de la misma.[145]

Los querellados enfrentaron, además, según expuesto en el Cargo III, imputaciones de conducta contraria al Canon 21 de Ética Profesional, _supra_, y a la CLÁUSULA DECIMONOVENA del contrato de servicios profesionales, particularmente, por no divulgar sus relaciones con terceros, y por no informar sobre su interés en adquirir la finca. Se alegó que esta situación presentaba un potencial conflicto de intereses, el cual afectaba el juicio profesional y el deber de fiducia de los querellados. El Canon 21 de Ética Profesional, _supra_, lee, en lo pertinente, como sigue:

> El abogado tiene **para con su cliente** un deber de lealtad completa. Este deber incluye la obligación de divulgar al cliente todas las circunstancias de sus relaciones con las partes y con terceras personas, y cualquier interés en la controversia que pudiera influir en el cliente al seleccionar su consejero. **Ningún abogado debe aceptar una representación legal <u>cuando su juicio profesional</u> pueda ser afectado por sus intereses personales.**

---

[144] <u>In re Rodríguez Mercado</u>, 133 D.P.R. 208 (1993).

[145] Exhibit Estipulado Núm. 3.

No es propio de un profesional **el representar intereses encontrados.** Dentro del significado de esta regla, un abogado representa intereses encontrados cuando, en beneficio de un cliente, es su deber abogar por aquello **a que debe oponerse en cumplimiento de sus obligaciones** para con otro cliente.

La obligación de representar al cliente con fidelidad incluye la de no divulgar sus secretos o confidencias y la de adoptar medidas adecuadas para evitar su divulgación. Un abogado no debe aceptar la representación de un cliente en asuntos que puedan afectar adversamente cualquier interés de otro cliente anterior ni servir como árbitro, especialmente cuando el cliente anterior le ha hecho confidencias que puedan afectar a uno u otro cliente, aun cuando ambos clientes así lo aprueban. Será altamente impropio de un abogado el utilizar las confidencias o secretos de un cliente en perjuicio de éste. (Énfasis nuestro.)

...

Esta norma ética atiende, principalmente, tres (3) situaciones particulares que deben ser evitadas por los abogados para no incurrir en la conducta proscrita: (1) representar a un cliente cuando para beneficiarlo es preciso abogar por algo que el abogado debe oponerse al cumplir sus funciones con otro cliente; (2) aceptar a un cliente para representarlo en asuntos que pueden afectar adversamente cualquier interés de un cliente anterior; y (3) representar a un cliente cuando su juicio profesional puede ser afectado por intereses personales.[146]

Precisamente, sobre esta última instancia el Procurador General enfocó primordialmente el presente procedimiento disciplinario. Esta vertiente exige que todo abogado ejerza un criterio profesional independiente y desligado de intereses personales.[147] Su aspecto teleológico es garantizar la más completa independencia de juicio por parte de los abogados al desempeñar sus funciones profesionales e impide que se erosione la confianza pública en las instituciones de justicia,[148] evitando que un abogado deje de realizar determinada acción

---

[146] In re Toro Cubergé, 140 D.P.R. 523 (1996).

[147] Íd; In re Vélez Barlucea, res. el 26 de octubre de 2000, 2000 TSPR 158, 152 D.P.R. ___ (2000), 2000 J.T.S. 170.

[148] In re Palou Bosch, supra.

en posible beneficio para su cliente, porque ésta frustraría algún interés propio que el abogado también quiera promover o defender.

Sobre este asunto, la Mayoría parte de una premisa, desde nuestro punto de vista y con mucho respeto, errónea o equivocada. Expresa que todos los contratos de servicios profesionales suscritos entre el Bufete de los querellados y la Oficina de Liquidación estaban formulados en términos amplios y disponían que los querellados representarían a la Oficina de Liquidación en todos los asuntos en que tuvieran que defender los derechos, obligaciones y prerrogativas de la Oficina, según establecidos en su ley habilitadora (Ley Núm. 55, supra); los abogados representarían a dicha oficna en los procesos de ejecución de hipoteca, resolución de contratos, cobro de préstamos hipotecarios y acciones civiles. Los querellados no contrataron con la Oficina asesoramiento legal alguno referente a la venta y disposición de los bienes inmuebles que en ese momento tenían a su cargo. El Procurador General no demostró con evidencia que los querellados desplegarían tal función. Por el contrario, de nuestro expediente surge que dicha función la descargaban dos organismos internos de la Oficina del Síndico, un Comité de Ventas que aprobaba en primera instancia la venta de los inmuebles y una Junta Ratificadora que revisaba tal actuación y ratificaba o revocaba la misma. Cada uno de esos organismos contaba con abogados internos que los asesoraban en tales funciones en forma regular y ordinaria. Veamos.

De la naturaleza del contrato de servicios profesionales surge claramente que no había obligación y deber de los querellados de asesorar a la Oficina en ninguna de las etapas del proceso de venta del inmueble en cuestión. Los querellados no asesoraron a la Oficina en relación a la negociación inicial con Express Realty, Inc. sobre la compraventa del bien inmueble en cuestión, según surge de la prueba presentada, ni tenían el deber y obligación de así hacerlo, por no ser parte de sus obligaciones contractuales con la Oficina.

Para que opere la prohibición, se requiere que el abogado se encuentre **ante la encrucijada de cumplir con su deber u obligación de asesorar adecuadamente a su cliente o de servir a sus propios intereses**. Dicha encrucijada no se desprende de este caso, porque los abogados, como cuestión de hecho, nunca asesoraron a la Oficina en cuanto a la compraventa del inmueble; y, como cuestión de hecho y de derecho, **no tenían la obligación o el deber de hacerlo**, a tenor con lo pactado en el contrato de servicios profesionales.

Para que entre en vigor la prohibición sobre conflicto de intereses dispuesta por el referido Canon, se requiere la existencia de una relación abogado-cliente, la cual **activa el deber u obligación** de asesorar o representar adecuadamente. Dicho de otro modo, el Canon 21, supra, requiere que técnicamente exista una relación abogado-cliente dual y conflictiva, previo al examen de la existencia de un conflicto de intereses.[149] **La ausencia de esta relación no permite la imposición de sanciones disciplinarias por violación al citado Canon 21, supra.**[150]

---

[149] In re Soto Cardona, 143 D.P.R. 50 (1997), (En este caso encontramos que no hubo una situación de conflicto de intereses, al no existir una relación abogado-cliente por el mero hecho de que el abogado **voluntariamente brindara asesoramiento** a una parte contraria que no contaba con representación legal, induciéndolo a error.); García O'Neill v. Cruz, 126 D.P.R. 518, 523 (1990) (Igualmente, resolvimos que técnicamente no existía un conflicto de intereses entre las funciones de abogado del licenciado Fuentes Rivera en un pleito civil contra el Municipio y su función como Asambleísta Municipal del municipio demandado en dicho pleito civil, por no existir la relación abogado-cliente dual.); In re Soto, 134 D.P.R. 772 (1993) (Asimismo, expusimos que **no está proscrita la representación simultánea** de dos coacusados, siempre que la misma no sea conflictiva); In re Belén Trujillo, 126 D.P.R. 743 (1990) (Aunque el querellado planteó la no existencia de una relación abogado-cliente dual y conflictiva, concluimos que por las circunstancias particulares del caso, los estudiantes confiaban que en el caso de que se presentaran dificultades el querellado los representaría legalmente, ya que existía un documento firmado por el querellado donde **expresamente** se señalaba que el licenciado Belén Trujillo **sería el representante legal** de los estudiantes.); In re Roldán González, 113 D.P.R. 238 (1982) (A diferencia de la situación planteada en García O'Neill v. Cruz, supra, aquí los abogados querellados **representaban y asesoraban** a la Asamblea Municipal, **a la vez que representaban** a ciudadanos particulares en pleitos contra el Municipio. Es decir, existía una relación abogado-cliente dual que luego resultó conflictiva.); In re Añeses Peña, 113 D.P.R. 756 (1983), (En este caso, la Administración de Compensaciones por Accidentes de Automóviles (ACAA) presentó una querella sobre conducta profesional contra el licenciado Añeses Peña, fundándose en que el querellado le había prestado servicios profesionales en asuntos obrero-patronales a

En todas nuestras decisiones sobre conflicto de intereses en que hemos impuesto una sanción disciplinaria al amparo del Canon 21, supra, **ha existido una relación abogado-cliente y, por lo tanto, una obligación o deber de asesorar o representar adecuadamente.**[151] En In re Belén Trujillo, supra, expresamos que:

> Por esta razón, es imprescindible determinar inicialmente si existe una relación abogado-cliente. **Ésta comienza <u>cuando el cliente acude al abogado a requerir sus servicios profesionales para que lo asesore o lo represente en un asunto jurídico.</u>**[152] (Énfasis nuestro.)

La médula de este procedimiento disciplinario es el contrato de servicios profesionales suscrito por los querellados con su cliente, la Oficina. Del mismo claramente se desprende que el Síndico nunca pactó con los letrados querellados para que le asesoraran en cuanto a la compra y venta de los bienes inmuebles bajo su custodia.

Ahora bien, precisa distinguir el caso de autos de In re Toro Cubergé, supra. En dicho caso, el licenciado Rafael Toro Cubergé se desempeñaba como **asesor legal** del Municipio de Yauco. El 5 de agosto de 1987 el licenciado Toro Cubergé creó la corporación PIMAR. El referido letrado era el dueño absoluto y controlaba plenamente los fondos, así como todas las transacciones de dicha corporación. Mientras el

---

la Unión Independiente de Empleados de la ACAA, a pesar de que también había sido el representante <u>de la agencia</u> en los últimos dos convenios que ésta y la unión negociaron. Examinados los hechos, este Tribunal concluyó que el hecho de que el querellado le hubiese dictado varias conferencias <u>sobre los problemas teóricos y prácticos de la negociación colectiva</u> **no constituía asesoramiento legal a la unión,** sobre la negociación colectiva entre ésta y la ACAA y, por lo tanto, no incurría en falta de ética de conflicto de intereses. Véanse, además, <u>Ortiz v. Soliván Miranda</u>, 120 D.P.R. 559 (1988); <u>In re Orlando Roura</u>, 119 D.P.R. 1 (1987); <u>In re Carreras Rovira y Suárez Zayas</u>, 115 D.P.R. 778 (1984); <u>In re Rojas Lugo</u>, 114 D.P.R. 687 (1983); <u>In re Concepción Suárez</u>, 111 D.P.R. 486 (1981).

[150] En cuanto a ese aspecto, establecimos en <u>In re Belén Trujillo</u>, supra, pág. 754, lo siguiente:

> Del lenguaje del propio Canon 21 del Código de Ética Profesional, supra, se desprende que están expuestos en sus dos (2) vertientes tanto el conflicto de intereses personales como el conflicto de obligaciones, y que se requiere la existencia de una relación abogado-cliente.

[151] <u>In re Pizarro Santiago</u>, 117 D.P.R. 197 (1986); <u>In re Carreras Rovira y Suárez Zayas</u>, supra; <u>In re Rojas Lugo</u>, supra; <u>In re Roldán González</u>, supra; <u>In re Martínez Rivera</u>, 106 D.P.R. 239 (1977).

licenciado Toro Cubergé se desempeñaba como **asesor legal** del Municipio de Yauco, PIMAR le vendió la referida finca a dicho municipio el 1ro. de agosto de 1988. El precio de venta fue por la cantidad de trescientos noventa y un mil novecientos setenta y seis dólares ($391,976), la cual constituía el valor en el mercado de la finca en cuestión.

En esa ocasión, este Tribunal concluyó que en el descargo del asesoramiento legal, <u>**al cual estaba obligado**</u> el licenciado Toro Cubergé, coincidieron intereses claramente antagónicos. De un lado, el interés del municipio en comprar la finca perteneciente a PIMAR (cuyo dueño era el licenciado Toro Cubergé)[153] y de otro lado, el manifiesto interés personal del referido licenciado en vender la finca a su cliente. Para la adquisición de dicha finca, se concluyó que el referido licenciado **estaba obligado a brindar su consejo profesional** a su cliente, el municipio. Ciertamente, el licenciado Toro Cubergé no podía en esta situación preservar un juicio profesional independiente, pues estaba viciado por sus propios intereses personales, transgrediendo de este modo su deber de fiducia para con su cliente, el Municipio de Yauco.

Censuramos al licenciado Toro Cubergé, al determinar que faltó a la ética profesional al continuar representando al Municipio de Yauco, cuando ya habían comenzado las gestiones para que dicho municipio adquiriera la finca que le pertenecía a través de PIMAR, corporación de la cual concluimos que era su "alter ego". Concluimos, además, que el licenciado Toro Cubergé tenía una dualidad de relaciones con el municipio, <u>**una como su asesor**</u> y <u>**otra como su vendedor**</u>, debiendo haber renunciado a asesorar o representar al municipio antes de que se iniciaran las gestiones de compraventa.

---

[152] <u>In re Belén Trujillo</u>, <u>supra</u>, pág. 756.
[153] El 25 de septiembre de 1983 la Asamblea Legislativa de Puerto Rico le asignó al Municipio de Yauco la cantidad de cuatrocientos mil dólares ($400,000) para la construcción de un parque de pelota urbano, incluyendo la adquisición de los terrenos necesarios para ello.

Es pertinente aclarar, que cuando se realizó la transacción de marras **aún no se había resuelto** In re Toro Cubergé, supra.[154] Sin embargo, los hechos del caso de autos se distinguen claramente de In re Toro Cubergé, supra. En el caso de marras **no se configuró una relación abogado-cliente sobre el aspecto de asesoramiento en la venta de inmuebles**, porque los querellados **nunca contrajeron una obligación o deber de asesorar a la Oficina** en cuanto a ese asunto. El Procurador General no demostró, ni desfiló prueba alguna, que existiera tal obligación o deber, **que no puede ser inferida**. Asimismo, del expediente de este Tribunal y del Informe del Comisionado Especial tampoco surge que los licenciados Morell Corrada y Alcover García asesoraran directa o indirectamente al Síndico sobre las negociaciones de venta de propiedades inmuebles a su cargo.

La Oficina del Síndico nunca estuvo huérfana de asesoramiento legal en cuanto a la compraventa de sus bienes inmuebles, porque dicha entidad tenía **otros funcionarios especializados y dedicados** particularmente a todo lo relacionado con la venta y disposición de sus propiedades inmuebles.[155] Dichos funcionarios conformaban el Comité de Venta de la Oficina, comité encargado de evaluar la compraventa y liquidación de los bienes inmuebles de la Oficina, **hecho que surge de la prueba desfilada por el Procurador General**.[156] En relación a los hechos del caso de autos, dicho Comité contaba con el asesoramiento legal de la licenciada Esther Marie Reyes, la cual, como parte de sus responsabilidades, redactó un memorando constatando la validez y legalidad de la transacción entre Express Realty y la Oficina.[157] De otra parte, las decisiones de este Comité de Venta eran revisadas por la Junta Ratificadora, creada para ese propósito. Asimismo, la Oficina

---

[154] Los hechos que motivan esta querella ocurrieron entre los años 1994 y 1995. El caso de In re Toro Cubergé, supra, fue resuelto el 2 de abril de 1996.

[155] Testimonio del licenciado Alcover García de 10 de noviembre de 1999.

[156] Exhibit V del Procurador General, págs. 246-250, 256-259, 330-335.
[157] Íd., pág. 337.

tenía una división legal, compuesta de dos (2) abogados internos, los cuales eran responsables de tales asuntos.[158]

El contrato otorgado por los querellados con la Oficina en esencia se limitaba a prestar servicios profesionales relativos a su representación profesional en los tribunales y agencias del Estado Libre Asociado de Puerto Rico y de los Estados Unidos y a ejecuciones de hipotecas o resoluciones de contratos (procedimientos ya descritos).

La naturaleza del contrato de servicios profesionales demuestra claramente que no había **obligación y deber** de los Bufetes II y III de asesorar a la Oficina en ninguna de las etapas del proceso de la venta del inmueble en cuestión. La referida propiedad no comprendía ninguna vivienda que estuviera desalojada o abandonada; tampoco una hipoteca que provocara la falta de pago de alguno de sus plazos.[159] No mediando hipoteca alguna en la transacción referida, ni tampoco estructura de vivienda, concluimos que no existía ninguna posibilidad de que fuese requerida la intervención de la firma de abogados de los querellados. No podía preverse, por ser especulativo, que el contrato de compraventa sobre dicho inmueble, cuyos términos y condiciones fueron negociados previamente entre Express Realty y la Oficina sin la intervención de los querellados, habría de ser objeto de algún tipo de controversia ante los tribunales.

Los querellados no asesoraron a la Oficina, en relación a la negociación sobre la compraventa del bien inmueble en cuestión, según surge de la prueba presentada, ni tenían el **deber y obligación** de así hacerlo por no ser parte de sus obligaciones contractuales con la Oficina. El presente caso no presentó ni siquiera una situación prima facie de conflicto de intereses.

En materia de conflicto de intereses personales, **cuando existe el deber y obligación de asesorar**, resulta interesante observar cómo en la

---

[158] Íd., págs. 125-126.

[159] Exhibit V del Procurador General.

mayoría de las jurisdicciones de Estados Unidos esa doctrina aplica de forma más práctica, brindando mayor atención a la naturaleza de los intereses económicos envueltos, las condiciones y los hechos particulares del caso.

El inciso (a) de la Regla 1.8 de las Reglas Modelo de Conducta Profesional de la A.B.A.,[160] regula las relaciones entre un abogado y su cliente cuando existe un potencial conflicto de intereses. Este inciso dispone:

> (a) A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest **adverse to a client unless**:
>
> (1) **the transaction and terms** on which the lawyer acquires the interest **are fair and reasonable to the client and are fully disclosed** and transmitted in writing to the client in a manner which can be reasonably understood by the client;
>
> (2) the client is given a reasonable opportunity to seek the advise of independent counsel in the transaction; and
>
> (3) the client consents in writing thereto. (Énfasis nuestro.)

La Regla 1.8, supra, no prohíbe todas las transacciones entre un abogado y su cliente. Todo lo contrario, dicha regla valida tales negocios jurídicos y los condiciona a ciertos requisitos: que sean justos y razonables; que se haga una divulgación al cliente sobre el interés del abogado en la propiedad; y que se le permita al cliente consultar otro abogado.

**Aún así, la Regla 1.8, supra, no aplica a situaciones en las que el cliente se dedica habitualmente a la venta de un producto o servicio. Es decir, un abogado puede entrar en negociaciones con un cliente sin ataduras de ninguna naturaleza si el cliente tiene como negocio regular y ordinario la venta del producto o servicio que pretende adquirir el**

---

[160] La mayoría de las jurisdicciones estatales y federales en los Estados Unidos han adoptado o utilizado las Reglas Modelo de Conducta Profesional ("Model Rules of Profesional Conduct"), promulgadas por el "American Bar Association" para regir las obligaciones éticas de los abogados.

**abogado.** Los comentarios a la Regla 1.8, <u>supra</u>, puntualizan, en lo pertinente, lo siguiente sobre este asunto:

> **[...] Paragraph (a) does not, however, apply to standard commercial transactions between the lawyer and the client for products or services that the client generally markets to others**, for example, banking or brokerage services, medical services, products manufactured or distributed by the client, and utilities' services. **In such transactions, the lawyer has no advantage in dealing with the client, and the restrictions in paragraph (a) are unnecessary and impracticable.** (Énfasis nuestro.)

De modo, que cuando un cliente tiene como negocio regular y ordinario la venta de determinado producto o servicio, se considera que el abogado está en plena libertad de entrar en negociaciones con su cliente, sin mayores ataduras.

La razón de ser de esta norma es obvia; lo que persigue es proteger al cliente de cualquier influencia indebida de su abogado, pues usualmente es el cliente la parte débil en la relación. Tales temores no están presentes cuando el cliente es una persona sofisticada y versada que se dedica a la venta de los productos o servicios que forman parte de su negocio. En situaciones como ésta no existe ventaja alguna posible para el abogado.

En algunas jurisdicciones en los Estados Unidos se ha resuelto que no procede la imposición de medidas disciplinarias cuando el abogado actúa de buena fe con el cliente y realiza un negocio razonable para éste y divulga tal situación a su cliente.[161] Inclusive, se ha resuelto que cuando la transacción es beneficiosa para el cliente no es necesario aconsejarlo sobre la necesidad de consultar un abogado independiente.[162] Al analizar cualquier imputación de conflicto de

---

[161] <u>People ex rel. Kent v. Denious</u>, 196 P2d 257 (Co 1948); <u>Ruth v. Crane</u>, 392 F. Supp. 724 (Pa. 1975); <u>Meara v. Hewitt</u>, 314 A.2d 263 (Pa. 1972); <u>In re: James</u>, 452 A.2d 163 (D.C. 1982); <u>The Florida Bar v. Bern</u>, 425 So.2d 526 (Fla. 1982); <u>In re: Schaumann</u>,252 SE.2d 627 (Ga. 1979); <u>Committe on Professional Ethics & Conduct v. Mershon</u>, 316 NW.2d 895 (Iowa); <u>The Florida Bar v. Jameison</u>, 426 SO.2d 16 (Fla. 1983); <u>In re: Gant</u>, 645 P.2d 23 (Or. 1982); <u>In re: Staples</u>, 486 P.2d 1281 (Or. 1971).

[162] <u>In re: Kirsh</u>, 973 F.2d 1454 (9no Cir. 1992).

intereses hay que prestar particular atención al grado de educación y sofisticación del cliente.[163]

La gran mayoría de las decisiones en las cuales se ha encontrado que un abogado ha incurrido en conducta antiética al adquirir una propiedad de su cliente estaba presente una situación de hechos en donde claramente el abogado había actuado de manera impropia al beneficiarse en detrimento de su cliente. En un gran número de estas decisiones el abogado adquirió la propiedad por un valor inferior al valor en el mercado de la propiedad.[164]

La Mayoría concluye que los querellados se dieron a la tarea de diseñar un esquema empresarial para adquirir un interés pecuniario en un bien de su cliente y de esta forma devengar un beneficio personal, motivando el procedimiento disciplinario que nos ocupa, a pesar y en violación a lo que disponía el contrato de servicios profesionales que establecía que los querellados no representarían a partes con intereses en conflicto; que le debían completa lealtad a la Oficina; que no tendrían intereses adversos con ésta; que divulgarían a la Oficina sus relaciones con terceros y cualquier interés que pudiera influir en la agencia; y que evitarían la apariencia de intereses encontrados. De nuestro expediente no surge que los querellados incurrieran en tal conducta. Los querellados no representaron a ninguna otra parte con intereses en conflicto con la Oficina, que ellos tuvieran el deber y obligación de proteger y defender a tenor con los términos y condiciones de su contrato de servicios profesionales. No surge de la evidencia presentada conflicto adverso alguno de los querellados, por el interés de sus esposas de que Costa Mar adquiriera de Express

---

[163] Stainton v. Tarantino, 637 F. Supp. 1051 (Pa. 1986); In re: Schlag, 96 B.R. 597 (Pa. 1986).

[164] State White v. Presnick, 509 A.2d 220 (Conn. 1989); The Florida Bar v. Swofford, 527 So.2d 812 (Fla. 1988); Committee on Professional Ethics and Conduct of Iowa State Bar Association v. Baker, 269 NW.2d 463 (Iowa, 1978); Louisiana State Bar Association v. Dickens, 550 So.2d 180 (La. 1989); Sodikoff v. State Bar of California, 535 P2d 331 (Sup. Crt. Cal., 1975).

Realty, Inc. sus derechos sobre el bien inmueble en cuestión con sus deberes y obligaciones, a tenor con el referido contrato de servicios profesionales. Tal situación estuvo completamente divulgada a la Oficina y al Síndico antes de que aconteciera, a pesar de que no tenía relación alguna con el deber y obligación profesional de los querellados para con la Oficina. No se violó el deber de lealtad de los querellados para con su cliente, a base de lo pactado en el referido contrato de servicios profesionales. No se demostró por el Procurador General que tal asunto afectara el juicio profesional independiente de los querellados, respecto a su deber y obligación para con su cliente, la Oficina. No está presente en el cuadro fáctico ante nos un "esquema empresarial" o el "uso de artimañas" de parte de los querellados para aprovecharse de una entidad gubernamental u obtener beneficios en forma impropia o ilegal a costa del bienestar común. No está presente en este caso una falta de transparencia de los querellados y sus esposas al adquirir Costa Mar de Express Realty, Inc. su interés propietario en el mencionado bien inmueble.

En el Cargo V se les imputa a ambos letrados la violación al Canon 38 de Ética Profesional, _supra_. Sobre este particular, el Canon 38, _supra_, lee como sigue:

**El abogado deberá esforzarse, al máximo de su capacidad, en la exaltación del honor y dignidad de su profesión, aunque el así hacerlo conlleve sacrificios personales y debe evitar hasta la apariencia de conducta profesional impropia.** En su conducta como funcionario del tribunal, deberá interesarse en hacer su propia y cabal aportación hacia la consecución de una mejor administración de la justicia. Tal participación conlleva necesariamente asumir posiciones que puedan resultarle personalmente desagradables pero que redundan en beneficio de la profesión, tales como: denunciar valientemente, ante el foro correspondiente, todo tipo de conducta corrupta y deshonrosa de cualquier colega o funcionario judicial; aceptar sin vacilaciones cualquier reclamación contra un compañero de profesión que haya perjudicado los intereses de un cliente; poner en conocimiento de las autoridades apropiadas todo acto delictivo o de perjurio que ante él se cometiera; velar y luchar contra la admisión al ejercicio de la profesión de personas que no reúnan las condiciones morales y éticas, así como de preparación académica, que nuestra profesión presupone. Todo abogado debe estar convencido de las condiciones idóneas morales y éticas de un aspirante al

ejercicio de la profesión antes de recomendarle para su admisión al foro.

Por razón de la confianza en él depositada como miembro de la ilustre profesión legal, todo abogado, tanto en su vida privada como en el desempeño de su profesión, debe conducirse en forma digna y honorable. En observancia de tal conducta, el abogado debe abstenerse en absoluto de aconsejar y asesorar a sus clientes en otra forma que no sea el fiel cumplimiento de la ley y el respeto al poder judicial y a los organismos administrativos. **De igual modo, no debe permitir a sus clientes, sin importar su poder o influencia, llevar a cabo actos que tiendan a influenciar indebidamente a personas que ejercen cargos públicos o puestos privados de confianza.** Lo antes indicado no impide, naturalmente, que un abogado dé a sus clientes su opinión informada y honesta sobre la interpretación o validez de una ley, orden o reglamento, que no ha sido, a su vez, interpretado o clarificado en sus disposiciones por un tribunal competente.

Todo abogado que abandone el servicio público debe rechazar cualquier empleo o representación legal en aquellos casos particulares en relación con los cuales haya emitido juicio profesional como funcionario público. (Énfasis nuestro.)

En este último cargo, al imputarse la violación al precitado canon, se indica que los licenciados Alcover García y Morell Corrada violaron el mismo, al no lucir puros y libres de influencias extrañas en su gestión profesional.

La presentación de dicho cargo parte de la premisa, esgrimida por el Procurador General, de que efectivamente existía una situación de conflicto de intereses. De manera que, en ausencia de una situación de conflicto de intereses, la alegada violación al Canon 38, supra, es improcedente en sus méritos.

**La apariencia de conflicto de intereses, no puede configurarse en una situación donde la naturaleza de los hechos denota una ausencia total de tal conflicto, por no estar presentes los elementos necesarios para que opere la prohibición del Canon 21, supra. En este caso en particular, por dos razones determinantes: el no haberse configurado una relación abogado-cliente entre los querellados y la Oficina en cuanto a las transacciones de venta y liquidación de sus bienes inmuebles; y porque los intereses de Costa Mar jamás advinieron en conflicto con los de la Oficina. En el momento en que los licenciados aquí querellados le manifiestan a la Oficina su interés en**

los terrenos, <u>ya los términos y condiciones del negocio jurídico en cuestión, habían sido previamente acordados con Express Realty</u>.

**Tal y como hemos señalado, cuando Costa Mar manifiesta su interés en un cambio en la figura del optante, la transacción estaba en una etapa en la que** no existían alternativas para negociar términos más favorables en cuanto a la compraventa. **De modo, que no hay siquiera cabida para un posible potencial conflicto de intereses en una situación** <u>donde no quedaba nada por negociar</u>. **Ya existía un previo acuerdo en cuanto al precio, la cosa y el objeto de la contratación. Acuerdo sobre el cual jamás se les imputó a los querellados ejercer influencia alguna.** Tampoco se desfiló prueba que sustentara esa alegación. Por el contrario, de la prueba sometida por el Procurador General surge claramente que el licenciado Antonio Cabrero Muñiz, Síndico Especial, declaró en un comunicado de prensa lo siguiente:[165]

> **Es de preocupación personal que sin base alguna se haya dicho al comienzo de la controversia entre Anibal (sic) Acevedo Vilá y Marcos Morell que esta Oficina vendió la propiedad por bajo precio a una entidad relacionada a éste (sic) último. Es mi interés aclarar de una vez por todas lo erróneo de lo manifestado.**
>
> **Considero que las manifestaciones vertidas solo (sic) sirven para tratar de empañar la labor de los empleados de esta sindicatura. Como podrá usted notar, la venta se realizó a favor de Express Realty Inc. por valor mayor a tasación. Se dio preferencia a otra entidad interesada en ánimo de promover el turismo en el área. Sin embargo, no estuvieron dispuestos a pagar cantidad mayor de $208,500.00 por 8.0399 cuerdas tasadas en $241,200. La Oficina cobró de Express Realty Inc. $255,165.15 por 6.8 cuerdas más $3,000 de gastos administrativos; Indicó el Síndico Especial.**

De los hechos de autos surge que la transacción de marras <u>no redundó en beneficio económico indebido</u> para los referidos letrados. La mejor evidencia de que los querellados <u>no procuraron ventaja alguna</u>, es una transacción donde el precio pactado en la opción de compra superó proporcionalmente en aproximadamente **un veinte por ciento (20%) el valor de tasación.** De ahí, que la compraventa de la finca realizada entre la Oficina y Express Realty (posteriormente adquirida por Costa

Mar), constituyó una transacción, **a todas luces, beneficiosa para la Oficina**.

Al considerar la totalidad de los hechos aducidos, y la falta de prueba en apoyo de los mismos, concluimos que no se configuró una violación al referido Canon 38, <u>supra</u>.

Aunque los hechos de marras no denotan una violación al Canon 38, <u>supra</u>, entendemos prudente expresarnos sobre una particular disposición que acuña el referido Canon, la cual le impone al abogado abstenerse hasta de la **"apariencia de conducta impropia"**. Nuestros Cánones de Ética Profesional fueron adoptados en 1935 y no sufrieron enmiendas sustanciales sino hasta el 1970, cuando se sustituyeron por un nuevo Código de Ética Profesional.[166] Desde entonces, nuestros cánones de ética han sufrido pocas enmiendas.

Tanto los Cánones de Ética Profesional de 1935, como el Código de Ética de 1970, provienen de las recomendaciones y trabajos realizados por la A.B.A. en el área de reglamentación de la conducta profesional.[167] De hecho, nuestro código de 1935 tomó como modelo los Cánones de 1908 aprobados por la A.B.A. El código de 1970 tuvo el propósito de adaptar a nuestra jurisdicción los antiguos Cánones de la A.B.A. de 1908, según estos habían sido modificados a través de los años.[168] Los Cánones de Ética Profesional de 1908 adoptados por la A.B.A., recogían la visión que sobre la profesión legal regía a finales del siglo XIX y a principios del siglo XX. Las funciones del abogado corporativo, así como las funciones del abogado negociador, consejero, planificador comercial y personal, y redactor de contratos y documentos

---

[165] Exhibit V del Procurador General, págs. 341-342, 346.

[166] L.M. Negrón Portillo, <u>Ética Profesional</u>, 1993, págs. 631-646.

[167] Comisión Revisora del Código de Ética Profesional, Colegio de Abogados de Puerto Rico, <u>Informe de Reglas de Conducta Profesional</u>, Junio 2000, págs. i-vii.

[168] Íd.

legales, entre otros, eran consideraciones casi inexistentes en el año 1908.[169]

Por esta razón, en 1969 la A.B.A. descartó los antiguos Cánones de 1908, después de 60 años. Al hacerlo se esgrimieron argumentos, tales como que los cánones fallaban en ofrecer guías adecuadas para la conducta ética y moral, carecían de coherencia, omitían áreas importantes de la práctica profesional y no eran adecuados para una supervisión disciplinaria efectiva.[170] En 1983, la A.B.A. nuevamente reformuló las normas de ética profesional,[171] promulgando así las hoy vigentes Reglas Modelo de Conducta Profesional.

La apariencia de conducta impropia, como estándar para imponer disciplina, quedó descartada en la elaboración de las Reglas Modelo de Conducta Profesional de la A.B.A. de 1983.[172] Dicho estándar es de dudosa constitucionalidad, cuando se utiliza como criterio único para disciplinar la conducta profesional, por su vaguedad y amplitud.[173] Es harto conocido que un estatuto es nulo por su vaguedad si: (1) una persona de inteligencia promedio no queda debidamente advertida del acto u omisión que el estatuto pretende prohibir y penalizar; (2) se presta a la aplicación arbitraria y discriminatoria; e (3) interfiere

---

[169] Íd.

[170] Íd.

[171] El nuevo formato de las Reglas Modelo se enfoca en la promulgación de normas más concretas que permitan la exigencia de su cumplimiento. C.R. Andrews, The First Amendment Problem with the Motive Restrictions in the Rules of Professional Conduct, 24 J. Legal Prof. 13 (2000).

[172] Reglas Modelo de Conducta Profesional de la A.B.A. de 1983.

[173] D.B. Wilkins, Legal Realism for Lawyers, 104 Harv. L. Rev. 468 (1990); Kramer, The Appearance of Impropriety under Canon 9: A Study of the Federal Judicial Process Applied to Lawyers, 65 Minn.L.Rev. 243, 264-265 (1981); M.P. Gallagher, Appearance Rule Stands For Now, But Sweeping Review Lies Ahead, 159 N.J.L.J. 769 (2000); O'Toole, Canon 9 o the Code of Professional Responsibility: An Elusive Ethical Guideline, 62 Marq.L.Rev. 313 (1979); M.F. Anderson, Motions to Disqualify Opposing Counsel, 30 Washburn L.J. 238 (1991); M. Booth, Lawyers Show Up In Force, Urging the Court to Scrap Appearance Rule, 158 N.J.L.J. 857 (1999); Liebmann, The Changing Law of Disqualification: The Role of Presumption and Policy, 73 Nw.U.L.Rev. 966 (1979).

con el ejercicio de derechos fundamentales garantizados por la Constitución.[174]

La vaguedad de la norma aludida podría violar en algunos casos el debido proceso de ley al cual tienen derecho los sujetos a un procedimiento disciplinario, pues el contorno de lo que pretende prohibir no está claramente definido.[175]

El Tribunal Supremo de los Estados Unidos se ha expresado a los efectos de que las licencias ocupacionales o profesionales constituyen un interés o derecho propietario.[176] Dicho Tribunal ha expresado que las acciones disciplinarias constituyen procedimientos adversativos de naturaleza cuasicriminal, con derecho los querellados a un debido proceso que incluye una adecuada notificación de la conducta impropia que se le imputa antes de que comience el referido procedimiento.[177]

La norma de "apariencia de conducta impropia" es evidentemente imprecisa y no provee un aviso adecuado.[178] Su aplicación podría tornarse arbitraria y discriminatoria.[179]

Más aún, con excepción de los casos que se refieren al campo de la notaría,[180] en ninguno de los otros casos resueltos por este Tribunal a la luz de esta norma ética se elaboraron guías adecuadas que ilustren a los letrados en torno al alcance de la referida norma y las posibles conductas sancionadas.

---

[174] Pacheco Fraticelli v. Cintrón Antonsanti, 122 D.P.R. 229 (1988). Véase, además, Pueblo v. Hernández Colón, 118 D.P.R. 891, 898 (1987); Grayned v. City of Rockford, 408 U.S. 1044, 108-109 (1972); Papachristou v. City of Jacsonville, 405 U.S. 156 (1972) y; Connally v. General Constr. Co., 269 U.S. 385, 391 (1926).

[175] In re Ruffalo, 390 U.S. 544, 551 (1968).

[176] Íd.

[177] Íd.

[178] Pacheco Fraticelli v. Cintrón Antonsanti, supra.

[179] Vives Vázquez v. Tribunal Superior, 101 D.P.R. 139 (1973); C.W. Wolfram, Modern Legal Ethics, St. Paul, Minnesota, 1986, págs. 319-321, 460-461.

[180] In re Colón Ramery, 133 D.P.R. 555 (1993).

De hecho, en los casos en que hemos disciplinado a un letrado por "apariencia de conducta impropia" bajo el Canon 38, _supra_, la conducta sancionada era efectivamente a todas luces impropia, a tenor con otro canon de ética. Cabe señalar, que cuando se sanciona a un letrado por violación al Canon 38, _supra_, como resultado de la violación a otro canon, se previene cualquier imputación de arbitrariedad en la aplicación de una norma que es en sí misma abstracta.[181] En _In re Sepúlveda Girón_,[182] establecimos que la apariencia de conducta impropia **tiene que sostenerse sobre la impresión que se da al público de la violación efectiva de alguno de los Cánones de Ética Profesional.**

Todas las jurisdicciones de Estados Unidos han descartado la referida norma ética, con excepción de Nueva Jersey, donde al presente se encuentra bajo un intenso ataque por parte de la comunidad jurídica.[183]

El concepto de "apariencia de conducta impropia" originalmente se acuñó en 1924, cuando la A.B.A. promulgó por primera vez un modelo de Cánones de Ética Judicial en Estados Unidos.[184] El origen del mismo históricamente se ha ligado al escándalo de la Serie Mundial de Béisbol de 1919.[185] En dicha serie el equipo favorecido para ganar la misma, los Medias Blancas de Chicago, perdió inexplicablemente ante los Rojos de Cincinatti.[186] Luego de una investigación, la Liga de Béisbol Americana concluyó que siete de los jugadores más importantes de los

---

[181] _In re Corrugated Container Antitrust Litigation_, 659 F.2d 1341, 1345 (5th Cir. 1981).

[182] Res. el 24 de octubre de 2001, 2001 T.S.P.R. 153, 155 D.P.R. ___ (2001), 2001 J.T.S. 156.

[183] M.P. Gallagher, _supra_; M. Booth, _supra_; H. Gottlieb, _Panel: Scrap the Appearance of Impropiety Rule Committee Finds No Support for Sustaining Stricture, Which Most States Have Long Abandoned_, 159 N.J.L.J. 769 (2000).

[184] Canon 4 del Código de Ética Judicial de la A.B.A de 1924.

[185] P.W. Morgan, _The Appearance of Property: Ethics Reform and the Blifil Paradoxes_, 44 Stan. L. Rev. 593 (1992).

[186] I.E. Sanborn, W. Wild, _Passes Giving Reds Victory_, CHI. TRIB., Oct. 3, 1919, pág. 1.

Medias Blancas aceptaron dinero de apostadores de gran escala a cambio de fallar deliberadamente en jugadas importantes y de esa forma contribuir a la victoria del equipo opositor.[187] La prensa tituló este fraude como el más grande de la historia del deporte en Estados Unidos, el cual tuvo gran impacto en el público estadounidense.[188]

Como consecuencia, la confianza del público en el deporte de béisbol resultó enormemente lesionada, lo cual provocó que los dueños de los equipos se motivaran en buscar una solución al problema. La encontraron en la selección y nombramiento del Juez Kenesaw Mountain Landis, como primer Comisionado de Béisbol de la historia de los Estados Unidos.[189] Su misión constituía en restaurar el honor del deporte, para lo cual se le dio amplio poder para tomar todos las acciones necesarias en la consecución de ese fin.[190] Paradójicamente, el descargo del Juez Landis de su ministerio judicial, mientras devengaba un cuantioso salario como Comisionado de Béisbol, provocó múltiples críticas en la comunidad jurídica.[191] Como consecuencia de tal problema, en 1924 la A.B.A. elaboró el primer Código de Ética Judicial para intentar restaurar la integridad y la imagen pública de la función judicial en la cual surge por primera vez la norma.[192]

Paulatinamente la norma de apariencia de conducta impropia se comenzó a utilizar en distintas opiniones y trabajos de la A.B.A. sobre

---

[187] E. Asinof, Eight Men Out: The Black Sox and the 1919 World Series, 1983, pág. 85.

[188] Íd. pág. 168.

[189] J.G. Taylor Spink, Judge Landis and the Twenty-Five Years of Baseball, 1972, págs. 72-79.

[190] Major League Agreement Art. I, Sec. 4, citado en M.B. Pachman, Limits on the Discretionary Powers of Professional Sports Commisioners: A Historical and Legal Analysis of Issues Raised by the Pete Rose Controversy, 76 Va. L. Rev. 1409, 1415 (1990).

[191] En 1920, Landis, ganaba siete mil quinientos dólares ($7,500) anuales como Juez Federal y cuarenta y dos mil quinientos dólares ($42,500) anuales como Comisionado de Béisbol. A. Boyer, The Great Gatsby, The Black Sox, High Finance, and American Law, 88 Mich.L.Rev. 328 (1989).

[192] American Bar Association, Report of the Forty-Seven Annual Meeting, (1924), pág. 68, citado en J.P. Mackenzie, The Appearance of Justice, 1974, págs. 180-182.

procedimientos disciplinarios de abogados, hasta que finalmente se incorporó en el Canon 9 del Código Modelo de la A.B.A. de 1969, y de ahí fue incorporado a nuestro actual Canon 38, _supra_. No obstante, la intención clara de los redactores del Canon 9 del Código Modelo de la A.B.A. de 1969 fue que dicha frase sólo tuviera un efecto exhortativo, y no que se utilizara como norma disciplinaria.[193]

En el Cargo IV, y apoyado en el Canon 34 de Ética Profesional, _supra_, el Procurador General le imputa específicamente al licenciado Alcover García haber solicitado y obtenido, a través del señor Medina Mercado, que el Subsíndico lo designara como notario en el otorgamiento de la escritura pública sobre compraventa entre Express Realty y la Oficina.

El Canon 34, _supra_, dispone sobre la instigación o gestión de pleitos. Dicha disposición, en lo pertinente, establece lo siguiente:

> Actúa contrario a los altos postulados de la profesión el abogado que, con propósito de lucro y sin ser requerido para que ofrezca su consejo o asesoramiento legal, aliente o estimule, en alguna forma, a clientes potenciales para que inicien reclamaciones judiciales o de cualquier otra índole. Es también contrario a la sana práctica de la profesión el que un abogado, sin ser requerido, bien lo haga personalmente o a través de personas, investigue o rebusque defectos en títulos u otras posible fuentes o causas de reclamaciones a los fines de beneficiarse en alguna forma mediante la prestación de sus servicios profesionales.
>
> Empaña la integridad y el prestigio de la profesión y es altamente reprobable el que un abogado, actuando directamente o a través de intermediarios o agentes, haga gestiones para proporcionarse casos o reclamaciones en que intervenir o para proporcionarlos a otros abogados. Incurre en igual falta el abogado que dé u ofrezca beneficios, favores o compensación de clase alguna a empleados públicos, ajustadores de seguros u otras terceras personas con el fin de ganarse su favor para el referimiento de asuntos que puedan dar base a reclamaciones o casos y, por ende, proporcionarle al abogado aumento en su clientela.

...

---

[193] Prefacio del Código Modelo de Conducta Profesional de la A.B.A. de 1969; y C.W. Wolfram, _supra_, págs. 58-59.

El referido canon prohíbe que un abogado, actuando directamente o a través de intermediarios, haga gestiones para conseguir casos o para proporcionarlos a otros abogados. La profesión legal ha mirado con recelo el uso de la publicidad y la solicitación.[194] Esta actitud parte de la concepción generalizada "de que la virtud y la buena reputación son la mejor promoción".[195]

Durante la reunión celebrada en febrero de 1995, el señor Medina Mercado le solicitó al Subsíndico que el licenciado Alcover García fuera el notario otorgante de la escritura sobre compraventa entre la Oficina y Costa Mar, si se aprobaba la sustitución en la figura del optante. **No se desfiló prueba por parte del Procurador General que sugiriera que el licenciado Alcover García le solicitara al señor Medina Mercado que lo seleccionara como notario**. La prueba estipulada por todas las partes reveló que la petición al Subsíndico, para que el licenciado Alcover García actuara como notario, surgió única y exclusivamente de parte del señor Medina Mercado.[196] Tampoco se realizó ninguna alegación específica y detallada que configure o fundamente alguna de las conductas proscritas en este Canon 34, supra.

A tenor con lo antes expuesto, concluimos que el licenciado Alcover García no incurrió en conducta violatoria de dicho Canon.

Por último, el Procurador General formuló alegaciones específicas en cuanto a la conducta del licenciado Alcover García, en su carácter de notario en las escrituras públicas relacionadas con las parcelas objeto de la mencionada compraventa.

---

[194] In re Ortiz Brunet, res. el 22 de noviembre de 2000, 2000 TSPR 170, 152 D.P.R. ___ (2000), 2000 J.T.S. 182; In re Franco Rivera y Masini Soler, 134 D.P.R. 823 (1993).

[195] Íd.

[196] Informe del Comisionado Especial, pág. 22; Exhibit Estipulado Núm. 3.

El Procurador General le imputó a ambos querellados haber redactado y otorgado la escritura sobre compraventa de los terrenos en cuestión entre la Oficina y Express Realty, para tres días después adquirirlos por el mismo precio. Reiteradamente hemos resuelto que la responsabilidad del notario no se extiende a los socios o asociados del bufete del notario autorizante, pues dicha responsabilidad **es personalísima e indisoluble**.[197] Por lo tanto, la gestión del licenciado Alcover García como notario otorgante de la referida escritura de compra y venta no le puede ser imputada al licenciado Morell Corrada.

La prueba demostró que el licenciado Alcover García no formaba parte de Costa Mar al momento de otorgar las escrituras, entre la Oficina y Express Realty, cuyo objeto era un bien inmueble sobre el cual Costa Mar ya tenía un interés pecuniario. El licenciado Alcover García no tenía interés económico en Costa Mar al momento de otorgar como notario las mencionadas escrituras, ya que entre él y su esposa existía una total y completa separación de bienes.[198] El referido letrado nunca tuvo interés de clase alguna en Express Realty.[199]

Por lo tanto, no se perfiló en este caso ningún impedimento al otorgamiento prohibido bajo el Artículo 5 de la Ley Núm. 89 de 5 de marzo de 1999, mejor conocida como "Ley Notarial de Puerto Rico de 1987",[200] tampoco bajo la Regla 7 del Reglamento Notarial de Puerto Rico.[201] Ni el licenciado Alcover García, actuando como notario, ni su esposa, fueron partes de las escrituras públicas cuestionadas. Tales documentos no tienen disposición alguna a favor del referido letrado, ni a favor de su esposa, ni de ningún otro pariente dentro del cuarto

---

[197] <u>In re Colón Ramery</u>, 138 D.P.R. 793,799 (1995); <u>B. & L., Inc. v. P.R. Cast. Steel Corp.</u>, 114 D.P.R. 808, 812 (1983) <u>In re Meléndez Pérez</u>, 104 D.P.R. 770, 777 (1976).

[198] Exhibit Estipulado Núm. 1, págs. 1-6.

[199] Exhibit Estipulado Núm. 32, págs. 169-174.

[200] 4 L.P.R.A. 2005 (a).

[201] 4 L.P.R.A. Ap. XXIV, R. 7.

grado de consanguinidad o segundo de afinidad. La señora Lilliam Ramos Medina, esposa del licenciado Alcover García, sólo compareció en calidad representativa en un documento notarial a posteriori, en el cual dicho letrado no intervino, ni otorgó, y aún de haberlo hecho, no era nulo, conforme a las disposiciones mencionadas de la Ley y el Reglamento Notarial.

En In re Hernández González,[202] expresamos que no era ilegal ni inmoral la actuación del notario al otorgar un documento notarial en que su hermano compareció como mandatario de la corporación.

En la reunión con el Subsíndico, el licenciado Alcover García concluyó que podía otorgar las escrituras sobre compraventa entre Costa Mar y la Oficina.[203] El artículo 5(a) de la Ley Notarial, supra, expresamente indica que un notario puede otorgar un documento público en el cual comparece un familiar dentro de los grados prohibidos por ley, si dicho familiar **lo hace en calidad representativa**. Dicho artículo lee como sigue:

> (a) Ningún notario podrá autorizar instrumentos en el que él intervenga como parte o que contenga disposiciones a su favor. Tampoco podrá autorizarlos si alguno de los otorgantes es pariente suyo dentro del cuarto grado de consanguinidad o segundo de afinidad, **excepto cuando aquél comparezca en el instrumento en calidad representativa.**

> (b) No producirán efecto las disposiciones a favor de parientes, dentro del cuarto grado de consaguinidad o segundo de afinidad del notario que autorizó el instrumento público en que se hicieron.[204] (Énfasis nuestro.)

Por su parte, la Regla 7, supra, dispone que un notario no podrá otorgar un documento público cuando comparezca una compañía de la cual él mismo o su cónyuge sean socios mayoritarios, cuando posean el cincuenta por ciento (50%) o más de las acciones o de la participación con derecho a voto. Dicha regla lee como sigue:

---

[202] 106 D.P.R. 456 (1977).

[203] Instrumento público que nunca fue otorgado por el licenciado José Alcover García como notario público.

[204] Artículo 5 de la Ley Núm. 89 de 5 de marzo de 1999.

Ningún notario podrá autorizar o protocolizar instrumento público alguno o autenticar documento alguno en el cual comparezca una corporación o persona jurídica de la cual él o su cónyuge, o ambos conjuntamente, **posean más del cincuenta por ciento (50%) de las acciones o de participación con derecho al voto.**[205] (Énfasis nuestro.)

La señora Lilliam Ramos Medina, esposa del licenciado Alcover García, era la socia administradora de Costa Mar, por lo que su comparecencia en dicho instrumento público hubiera sido en calidad de representante de dicha sociedad. La señora Lilliam Ramos Medina tenía una participación equivalente a un tercio (1/3), lo cual la convierte en socia minoritaria de la sociedad especial de Costa Mar. **De modo, que fue correcta la afirmación del licenciado Alcover García de que no existía impedimento para haber podido otorgar la escritura pública sobre compraventa entre la Oficina y Costa Mar, transacción que nunca se efectuó.**

Si no existía impedimento para que el licenciado Alcover García pudiera otorgar la escritura pública sobre compraventa de las parcelas opcionadas, en la cual comparecería su esposa representando a Costa Mar de una parte, y la Oficina de la otra parte, resulta forzoso concluir que también podía otorgar la escritura pública sobre compraventa entre Express Realty y la Oficina.

**Concluimos, que el Procurador General no probó ninguno de los cargos presentados, como se requiere en el presente procedimiento disciplinario. Recientemente, establecimos que el _quantum_ probatorio que debe utilizar este Tribunal en casos disciplinarios es el de prueba clara, robusta y convincente, por imperativo del debido proceso de ley, al estar en juego el título de un abogado y su derecho a ganarse la vida con el ejercicio de su profesión.[206] Tal criterio es uno más riguroso que el de preponderancia de la prueba.[207] El Procurador no**

---

[205] Regla 7 del Reglamento Notarial de Puerto Rico, 4 L.P.R.A. Ap. XXIV, R. 7.

[206] _In re Caratini Alvarado_, res. el 9 de marzo de 2001, 2001 TSPR 46, 153 D.P.R. ___ (2001), 2001 J.T.S. 45.

[207] Íd.

**alcanzó el estándar de prueba requerido para este tipo de procedimiento, más aún, su prueba no sostuvo ninguna de sus alegaciones.**

No vemos, bajo las circunstancias particulares de este caso, cómo lo actuado por los querellados lesionara, según la Mayoría, intereses de alta jerarquía que atentara contra la salud fiscal de la Oficina. No encontramos la forma en que tal actuación haya socavado la confianza pública en sus instituciones, como afirma la Mayoría. No se desprende de la evidencia presentada por el Procurador General una conducta de los querellados dirigida a explotar en forma impropia, y en contravención al contrato de servicios profesionales, una relación de naturaleza profesional con una entidad pública. La transacción de la Oficina con Express Realty fue justa y razonable y beneficiosa económicamente para la primera. Los hechos ante nos no presentan, ni por asomo, un caso de corrupción. **No creemos como justo y razonable asociar las circunstancias particulares de este caso con "la corrupción que alcanza niveles intolerables", y con que "nuestro país requiere transparencia en sus instituciones y los abogados que representan el interés público".**

VI

Por los fundamentos antes expuestos, disentimos. Exoneraríamos a los licenciados Marcos A. Morell Corrada y José B. Alcover García de los cargos formulados en su contra.

Efraín E. Rivera Pérez
Juez Asociado